# **EXHIBIT A**

# CHEESWRIGHTS
## NOTARIES PUBLIC

N P Ready
R M Campbell
J B Burgess
E Gardiner
A J Claudet
I A Rogers

A Grafton



TO ALL TO WHOM THESE PRESENTS SHALL COME, I **NIGEL PETER READY** of the City of London, England **NOTARY PUBLIC** by royal authority duly admitted, sworn and holding a faculty to practise throughout England and Wales, DO HEREBY CERTIFY the genuineness of the signature subscribed to the certificate attached to the copy award hereunto annexed, such signature having been this day subscribed in my presence by **BRUCE ANTHONY HARRIS**, one of the arbitrators named and described in the said award;

AND I DO FURTHER CERTIFY that the said annexed copy award, each page of which has been initialled by the said Bruce Anthony Harris, is a true and faithful copy of the original of the said award, I having carefully collated and compared the said copy award with the said original award and found the same to agree therewith.

IN FAITH AND TESTIMONY WHEREOF I the said notary have subscribed my name and set and affixed my seal of office in London, England this twelfth day of September in the year two thousand and eight.

# Bruce Harris

Flat 101, 7 High Holborn, London WC1V 6DR

Tel. 020-7404 9823  Fax. 020-7404 9824

E-mail: bruce.harris@bruceharris.org.uk

[PLEASE NOTE NEW EMAIL ADDRESS]


I, the undersigned Bruce Anthony Harris of the above address, Fellow of the Chartered Institute of Arbitrators, hereby certify that the attached document consisting of 51 pages of text, plus a backsheet, each initialled by me, is a true and faithful photocopy of an original arbitration Award issued and signed by the members of the tribunal referred to therein, of which tribunal I was chairman, and that the said original Award was signed by each member of the tribunal on page 51 thereof, as shown in the attached copy.


12 September 2008

**IN THE MATTER OF THE ARBITRATION AND CONCILIATION
ACT 1990
CHAPTER A18 of LAWS OF THE FEDERATION OF NIGERIA 2004**

**AND**

**IN THE MATTER OF AN ARBITRATION**

**BETWEEN:**


CONTINENTAL TRANSFERT TECHNIQUE LIMITED

Claimant

and


1)    FEDERAL GOVERNMENT OF NIGERIA
2)    ATTORNEY GENERAL OF THE FEDERATION
3)    MINISTER OF THE INTERIOR

Respondents


**"CERPAC" Agreement dated 25 May 1999 (as amended)**

**FINAL AWARD**

1.    An agreement in writing ("the agreement") dated 25 May 1999,
was entered into between the Federal Ministry of Internal Affairs
of the Government of Nigeria (now the Ministry of the Interior,
the third respondent in this arbitration) and the claimant,
Continental Transfert Technique (wrongly transcribed here and
in some other documents as "Technical") Limited, of Lagos, for
the provision by the claimant of computer-legible and 21st
century computer-compatible cards to replace the paper
Expatriate Residence Permit and Aliens Card then currently in
use. The new card was to be known as CERPAC: Combined
Expatriate Residence Permit and Aliens Card.

2.    The agreement set out a specification for the card to be provided. It also provided that the Ministry would charge $250 for each card, though non-ECOWAS African applicants would pay only $100 per card. The claimant was to designate "the participatory banks mutually acceptable to the parties" (but the agreement did not spell out the functions of those banks), and the Ministry was to designate a bank into which funds accruing to it would be paid by those banks. Further, from the fees of $250 (or $100) "the sharing ratio" was to be "(a) 50% to Government (b) 40% to [the claimant]  (c) 10% to the designated account of the Ministry as operating costs." There were no express provisions in the agreement as to what those operating costs were anticipated to be, nor as to who it was expected would incur them, nor as to what ultimately was to happen to the 10% share so collected.

3.    The claimant undertook
   a.    To provide 100 units of computerized   magnetic    card swipe machines.
   b.    To install and commission complete equipment for image capture and printing and issuance of CERPACs at 8 Zonal locations ...
   c.    To provide technical staff back-up.
   d.    To undertake training of Nigeria Immigration Personnel
   e.    To bear the cost of all relevant equipment.
   f.    To hand over all the equipment to the Ministry at the end of the contract.

4.    For its part the Ministry was to provide suitable office accommodation for CERPAC centres to be established at the 8

Zonal offices, a suitable accommodation for the Central Data Bank in Abuja and operational vehicles.

5. Each party was jointly to bear and pay all withholding taxes, VAT, fees, levies and other relevant charges in connection with the agreement as might be imposed under Federal or State laws in Nigeria in the ratio of 60:40.

6. It was also provided that the agreement embodied the entire contract with respect to its subject matter and "there are no prior representations, warranties or agreements relating thereto. It shall not be modified except by a duly signed instruction in writing. No servant officer or agent of either party has authority to vary it other than by such an instrument."

7. The agreement contained an arbitration clause providing for any dispute arising that could not be settled amicably to be referred to arbitration in accordance with "the Arbitration and Conciliation Act Cap.19 Vol.1 Laws of the Federation of Nigeria 1990". Nigerian law was to govern the proceedings and the award was to be final and binding on the parties. The contract was to be governed and construed in accordance with the laws of the Federal Republic of Nigeria.

8. Lastly, so far as relevant provisions go, the final clause of the agreement provided, under the rubric "EFFECTIVE DATE OF CONTRACT" that it should be "effective for 5 ... years exclusive of the one year preparatory period." However, no start date was spelt out, and there was no explanation as to what was anticipated during the one year preparatory period.

Whilst it seems likely that, without more, the agreement of May 1999 could only have been implemented with great difficulty, having regard to the lacunae identified, and others, that is of no importance, not least because, subsequently, addenda were agreed that certainly made the contract workable. But before turning to those it is necessary to mention another agreement entered into on 26 May 1999, one day after the agreement just dealt with.

10.    That was a tripartite agreement ("the tripartite agreement") made between the Federal Ministry of Internal Affairs, the claimant and Afribank Nigeria Plc ("Afribank"). That referred to the agreement just mentioned and its provision that the Ministry would designate a bank where "it shall maintain an account into which applicants would deposit money for the CERPAC cards", and continued by providing that the Ministry "hereby designates Afribank ... for a period of ... 5 years from the date of signing this agreement as the bank into which the money for the CERPAC cards ... will be deposited."

11.    The tripartite agreement also recited that the claimant had requested and Afribank had agreed to grant the claimant a credit facility "to enable [the claimant] to execute the contract successfully". The Ministry was further to open accounts in each of the 8 Zones referred to in the agreement into which applicants for CERPAC were to pay fees, and the claimant would open an account with Afribank in Abuja "into which the [claimant's] fee of N11,000 ... less deduction for taxes levies and charges being N1,100 for each CERPAC card issued will be lodged/deposited".

4

Afribank was empowered by the tripartite agreement to credit the claimant's account with them with N.10,000 "being [claimant's] fee for each card and conversely the Ministry's account ... will be accordingly debited with N10,000.00 ... from payment for each card at source."

13. Although the claimant started to accumulate equipment and prepare to perform its part of the contract, because of the change of government that occurred shortly after the agreement had been concluded all government contracts had to be reviewed and this caused the respondents to postpone implementation from their side. However, on 4 February 2002, almost 2 years later, the same parties concluded an addendum ("the first addendum"). By that time, the development of information technology having moved on in leaps and bounds, the whole concept of the intended cards was, on the claimant's uncontradicted evidence, changed and broadened such that the project had become quite different from that originally envisaged.

14. That addendum was concluded against a background in which the government's review of the contract had led it to require that certain provisions be changed (in ways that were ultimately agreed: see below). Further in late 2000 there were, the evidence showed, two developments of some relevance. On 11 August 2000 a meeting was held, chaired by the third respondent's Permanent Secretary, following the government's review. At that it was said that the third respondent's Ministry was convinced that the claimant had the necessary equipment "on the ground". The agreement had been considered by the Federal Executive Council which appears, amongst other things, to have suggested that the contract should be put out to tender

anew if negotiations with the claimant were unsuccessful. The Council had also indicated that the sharing formula should be amended in government's favour, and that the original 5-year period should be shortened to 3 years.

15. The claimant apparently noted that the original period was "based on the total cost of the equipment, training and the projected revenue as well as the cost of the consumables". However, it agreed to limit the duration to 3 years as requested by government. It was agreed by the meeting that re-negotiation with the claimant was preferable to the idea of calling fresh tenders "in order to avoid litigation or stalling of the project". The claimant was, therefore, to prepare its proposals in accordance with the discussions.

16. On 18 December 2000, the claimant's then lawyer wrote to the third respondent referring to the May 1999 agreement but, perhaps curiously, not to the August 2000 discussion. He said that the claimant had incurred expenses running into "several millions of dollars", that its equipment had continued to arrive, attracting "huge sums of money by way of customs duties and demurrage charges", that it had been waiting for clearance from the Federal Executive Council but that its patience was exhausted and that it was under heavy pressure from banks and financial institutions to which it was heavily indebted. However, the letter concluded "We are mindful of our special relationship with this government and therefore we would not want to do anything which would have negative implications on the relationship" and asked for a positive response. It is not clear, on the evidence, just what happened between this letter and the signing of the first addendum on 4 February 2002, over a year

later; but it is clear that this addendum was concluded against the background just set out.

17. The first addendum started by reciting that the "due implementation of [the agreement] was vitiated by unforeseen circumstances beyond the reasonable contemplation of the parties" and continued by reciting that the claimant continued to mobilise resources for the execution of the agreement "pending finalization of requisite procedures" by the Ministry; and that the government had "ultimately cleared the contract for execution under new terms and conditions acceptable to both parties".

18. It went on to recite that the claimant had "accepted a lower percentage of 30% of the profit instead of the earlier proposed and accepted 40% as per the ... agreement of 25th May, 1999 provided however that the [claimant's] initial set-up expense as detailed and approved by the Federal Executive Council would be deducted before sharing of profits." It may here be observed that the agreement had referred not to profit or profits, but rather to a sharing of the "fees", i.e. the gross income from sale of CERPAC cards. However, nothing turns on this. It is also appropriate to observe at this point that, under the addendum, the claimant was to recover its set-up expenses, which was not the case under the 1999 agreement.

19. The first addendum continued by reciting that the claimant "has accepted a reduction in the initial term of the contract from 5 ... years as per the Agreement of 25th May, 1999 to 3 ... years provided however, that the reduced term is based:-

(i) On the production of 300,000 Residence Permits and 200,000 Alien Registrations per annum respectively as projected by the Nigeria Immigration Service.

(ii) The understanding that at the expiration of the final term and before handover the Ministry and the [claimant] are duly satisfied as to the technical performance of the Immigration Staff scheduled to take over the project.

20.   Against the background of those recitals, the first addendum (which was expressly said to be "an integral part of the Agreement of 25th May 1999") provided (and we quote):

(i)   That based on a projection of 300,000 Residence permits and 200,000 Alien Registration booklets and cards to be issued annually the revenue accruing for the sale of CERPAC should be deposited at the designated bank upon payment of approved fees.

(ii)  That the sharing formula of accruing revenue after deducting cost would be in the ratio of 60% to Government 30% to the [claimant] and 10% being operating expenses to the Ministry.

(iii) That both parties shall ensure adequate training for Immigration personnel who will be involved in the actual implementation of the project at the various approved locations after satisfactory handover of the project to Government.

(iv) That the [claimant] shall in addition to other obligations have responsibility for the provision of office accommodation and Station Wagon and one Mitsubishi Double Cabin Van for the execution of the project in all the approved centers.

(v) ...

21. Attached to the first addendum was a very detailed specification for the project, which ran to some 28 pages, and which concluded with a summary of the costs involved. The total was shown as =N=276.60 million.

22. On 23 May, 2003, the parties signed a further addendum ("the second addendum"). That acknowledged in its recitals, *inter alia*, that the scheme was dynamic, that consequently the parties had made provision for amendment of the 1999 agreement as and when the need arose, that such agreement allowed the parties to modify it in writing and to change or upgrade all material in keeping with developments in technology,  and that the parties had met regularly to appraise progress of its implementation and to approve changes which had necessitated the provision of extra items due to advances in technology and facilities which were not provided for in the original agreement of 1999. It further recited that the parties had agreed that two new tamper-proof forms were needed; that the claimant had agreed to establish units at the four international Nigerian airports, and that vehicles should be equipped with mobile digital personal identification equipment.

23. The second addendum went on to say that, in consideration of the supply of extra items and facilities, details of which were annexed, the contract price for the project was now =N=4,179,994,500.

24. Said to be annexed to the second addendum, and specifically referred to in it, were the minutes of four meetings the parties had jointly attended and which led to the addendum. Only the minutes for three of those meetings were adduced in evidence.

9

25. There was thus a contract between the claimant and the third respondent which consisted at least of the 1999 agreement and the two addenda just referred to, together with their annexed documents. In due course disputes arose under that contract between the parties, more fully particularised below, and were referred by the claimants to arbitration. The claimants appointed as their nominated arbitrator me, the undersigned Sarosh Zaiwalla of C-113 Parliament View, 1 Albert Embankment, London SE1 7XN, England (a practising English Solicitor and former Member of the International Court of Arbitration of the International Chamber of Commerce, Paris) and the respondents appointed as their nominated arbitrator me, the undersigned Chief Assam E. Assam of 13 Ediba Lane, Calabar, Nigeria (practising Senior Counsel of the Nigerian Supreme Court). In due course the two said arbitrators appointed me, the undersigned Bruce Harris of Flat 101, 7 High Holborn, London, WC1V 6DR, England (former Chairman of the Chartered Institute of Arbitrators and former President of the London Maritime Arbitrators Association) as third arbitrator.

26. On 19 March 2008 we met, by arrangement and with the agreement of the parties, in London, with Mr Wole Adebayo, the claimant's advocate, and Mrs Ngozi O. Jipreze from the Ministry of the Interior and Mr Simon Egede from the Ministry of Justice (together then representing the respondents), and gave directions for the conduct of the arbitration. It was agreed, *inter alia*, that the respondents should be named as above (and hereafter we refer consistently to "the respondents" collectively, although in fact it was the third respondent's Ministry that was involved in the matter, and the respondents' position was that the first and second of them were simply nominal respondents). It was further agreed at that meeting that whilst the place of the

10

arbitration was and remains Nigeria (that being the implication of the arbitration clause referred to in paragraph 7 above), all hearings should take place in London, and that the arbitration should be conducted in accordance with the First Schedule to the Arbitration and Conciliation Act of 1990. A hearing in London was fixed for two working weeks commencing 2 June 2008.

27.   The hearing in fact took place, as agreed, at the International Dispute Resolution Centre, 70 Fleet Street, London EC4Y 7EU, on 2-6 June, 9-10 June and 12-13 June 2008. Mr Adebayo (assisted by Miss Omotola Adu) represented the claimant and Mr Oluyomi Olawore (assisted by Mr Kola Sinaike and Ms Mirabel Edozie) represented the respondents.

28.   Both parties brought to London and called witnesses who were duly examined. Those witnesses were: for the claimant Dr B. Berry, the claimant's managing director, Mr S. Reddy, their financial controller and chief operating officer, Mr H.C. Gambhir, their general manager, and Mr G.D. Arora, their deputy manager (IT); and for the respondents Mr H.W. Dayar, deputy director (accounts) of the third respondent, Mr A.A. Aliyu, chief superintendent of immigration, Mr E.C. Nnamdi, an assistant comptroller-general of immigration, Mr A.A. Osinaike, an immigration officer, and Mr M.C. Mbakwe, head of IT in the third respondent's Ministry.

29.   The claimant had wanted to call three other witnesses but they were unable to obtain visas in time and video conferencing arrangements proved impossible to arrange. Accordingly we agreed to admit their witness statements for what value they might have, always bearing in mind the impossibility of testing their evidence by cross-examination.

**30.   *The disputes***

In outline only at this stage, the differences between the parties were these. The claimant said that, whilst it had performed its part of the contract, the respondents had failed to perform its part, particularly in misrepresenting the numbers of cards that would be required each year, as a result of which the revenue – and thus the claimant's share - was far short of what had been bargained for. The claimant also said that the respondents had delayed the start of the project until February 2002; that in 2005 the respondents unilaterally and wrongfully suspended sales of the application forms, and that the respondents had wrongfully put pressure on the claimant for it to refund certain monies paid to it by the respondents.  Further, the claimant contended that the respondents had acted in breach of contract by issuing forms to banks other than Afribank in 2005. For some of these matters the claimant claimed damages put at a total, ultimately, of =N=51,162,000,000. We deal with the breakdown of that total claim later. By way of late amendment a further =N=20 billion was claimed: see paragraphs 52-57 below.

**31.**   For their part, the respondents denied liability. They said that they had not broken the contract in any of the respects alleged, and in particular that the reference to 300,000 cards per annum was no more than a contingent condition that had failed and that consequently the contractual situation reverted to that which prevailed before the first addendum (namely a contract for five years rather than three). They also advanced a counterclaim totalling =N=4,049,210,000 (for which the claimant denied liability) in respect of certain items of equipment they said had not been delivered, tax, certain alleged overpayments, damages

for alleged failure to train personnel, and for interest. Again, we shall deal with the breakdown of the counterclaim below.

32. **General background comments**

Before considering the case in any detail we think it appropriate to make some observations on general matters that have informed our approach to this case. Firstly, it has to be said that the events in question have taken place over a considerable period of years, starting as long ago as 1999. That has a number of implications. For one thing, it means that – especially as regards events that took place in the more distant years – memories are bound to have dimmed, in our experience quite considerably. In addition, the mind has a tendency to reconstruct events and conversations in line with what the individual wishes had happened or thinks ought to have happened. Another consequence is that it is difficult to recall accurately precisely when, in such a long period, particular events occurred or conversations took place. Once more, wishful thinking easily comes into play.

33. Secondly, a number of the respondents' witnesses were not involved in the matter in its earlier years. So their evidence was based on what they had been told and what they had read in files they had inherited. Where we could see the documents upon which they relied that was a factor of less significance, but in many cases we did not do so.

34. That leads us to our third consideration: it is clear to us that we only had before us a selection of the parties' relevant documentation that was relevant to the disputes. They had, it seems, in line with the relevant Arbitration Rules, generally only produced documents supporting their respective cases, and no

order for general disclosure of relevant documents was sought or made. However, whilst the parties were within their rights in this respect, it is plain to us that other documents – probably many other documents – must exist, especially in the respondents' files, that would almost certainly have provided useful material for cross-examination and for our assessment of the issues.

35.   During the hearing, when it suited them, each party produced new documentary material; and in one case a witness for the respondents started to give evidence referring to a document which even the respondents' lawyers had plainly not seen.

36.   We have decided the case on the evidence actually provided to us by the parties.

37.   Fourthly we bear in mind that the parties were working against a background of a situation that was changing, at times dramatically and radically. For one thing, the Nigerian political situation changed drastically in 1999, after this agreement had been entered into, in a way that had various ramifications for this agreement. For another, the project the subject of the agreement was, plainly, heavily IT-based, and it is well-known that in the last few years technology has progressed by leaps and bounds, such that what seems a dream one day is a very practical reality only a few weeks or months later.

38.   Fifthly, and with no disrespect to either side, it is clear that the agreement and the addenda were not drawn up with the greatest attention to legal niceties: although on occasions the terminology and layout appear very formal, in fact the effect of some wording is plainly not what was intended, there are

important gaps and ambiguities, recitals set out matters of substantive agreement rather than pure background, etc., etc. In these circumstances, and bearing in mind that (although there was a government on one side) the contract here was very much a commercial one, we think it right to take a pragmatic, commercial approach to the construction of the agreement documentation, whilst of course having full regard to the law and giving full weight to the agreement's wording; and also to have regard to what the parties plainly, as a matter of fact, intended it to mean, as evidenced by their words and deeds.

39.   Whilst in this section of general observations, we must express our thanks to the witnesses who came to help us and who gave evidence, sometimes at considerable length. It is, we know, not an easy task to be cross-examined by formidable counsel, especially about matters that happened years ago. But we are persuaded that all the witnesses did their best to help us, and spoke in good faith. Where (as must inevitably happen) we have not accepted a piece of evidence, that is not because we think the relevant witness was doing anything other than genuinely trying to help us, but is because the relevant documentation and/or other evidence and/or the inherent probabilities have led us to do so.

40.   Bearing these last comments in mind, we have thought it undesirable that we should endeavour to summarise each witness's evidence and to express our views on it. That might be invidious in some instances, and in any event it seems to us unnecessary. We have of course read and re-read the witness statements and the transcripts of the witness evidence given before us, and we have also been assisted by summaries and submissions made by counsel (to whom we are generally much

indebted) in their written and oral closings. What we seek to do hereafter is to explain fairly concisely our reasons for reaching our various conclusions, without giving what might be described as "reasons for our reasons".

41.     Lastly we have considered the possibility of, at this stage in the Award, attempting an exposition of the contractual arrangements between the parties as we see them, having regard to our construction of the agreement and the addenda in the light of all the surrounding circumstances. However, we do not feel that would be appropriate, or that it would make much sense in isolation, and have concluded that it is best to express our views and the consequences to which they lead against the background of a fuller exigesis of the disputes and the parties' contentions.

42.     **The claims – (1) Loss of advances**

The claimant said that, following the signing of the 1999 agreement it placed orders with suppliers and recruited staff, but that owing to the respondents' inability to start implementing the contract at that time, it lost about =N=789 million on account of forfeiture of advances by the suppliers in question and other expenses incurred on its side in seeking to implement the agreement. For their part, the respondents pleaded that the cause of the agreement not being implemented immediately in 1999 was the late arrival of the claimant's personnel and equipment as well as political factors outside the respondents' control. Further, said the respondents, the parties mutually waived the non-implementation of the agreement in the second addendum, and it was in the parties' contemplation when entering into the 1999 agreement that a change of government would take place shortly thereafter, as

in fact happened. In addition, the respondents said that they were not responsible for any delay, no commencement date was inserted into the agreement deliberately, and alternatively the claimant had waived any rights it had in respect of this claim.

43. In reply, the claimant denied the respondents' allegations, maintaining that its equipment and personnel arrived on time, that the "political factors" relied upon were non-existent, and that in any event the perpetual succession of government could not admit of any such argument.

44. At the conclusion of the hearing the respondents argued that no evidence had been led to support this claim in any event. They said that receipts were not produced for recurrent expenditure. Such evidence as there was showed the import of goods between 2000 and 2001 which were used in any event, and thus – as we understand the argument - were covered by set-up costs (referred to below). And in respect of an invoice for $2 million in respect of software design, allegedly forfeit because of failure to proceed in 1999, Mr Arora had said in evidence that the same design was ultimately used when the project got under way and therefore there was no loss in that respect.

45. We should say that, whilst we are not entirely sure that the meaning of Mr Arora's answer was quite intended to be that put upon it by the respondents in their submissions, it is right that it was capable of that sense; further, it seems to us far more likely than not that the software design was indeed used, and that such equipment as the claimant acquired before the first addendum was used ultimately. If that had not been the case we think there would have been far clearer evidence to that effect,

and indeed probably vociferous contemporaneous complaints from the claimant. At all events, we cannot be satisfied on the evidence that the claimant has proved the loss it complains of, even if it could show a breach by the respondent giving rise to some such loss. And we do not think it can do that: the 1999 agreement itself contained no start date but did refer to a one year preparatory period; it said nothing about the claimant having any right to recover its investment, and against the background we have summarised, we cannot conclude that the necessary breach and/or the requisite causal connection leading to the (unproven) consequences complained of have been shown.

46.   In addition, since under the second addendum the claimant was to be paid – and ultimately was in fact paid - its set-up costs, it would be extraordinary if the claimant had not taken account, in fixing the amount it claimed under this heading, of the advances referred to. Similarly, if it was considered by the claimant that it had a sound claim for such advances, it is remarkable that it was not advanced sooner than it was: it only seems to have appeared when arbitration was in mind, and even then it was placed last in the claimant's claims, though chronologically it arose first.

47.   In the light of these considerations, but also independently of them, it seems to us that, as a matter of construction of the first addendum, the parties effectively agreed what is sometimes called a "wash-out" in respect of past expenditure. This is, in the circumstances, what one might expect. The parties were, in effect, agreeing to start again on new terms (although to an extent on some of the previous terms too). They agreed in the first preamble that "due implementation of the ... [1999

agreement] was vitiated by unforeseen circumstance beyond the reasonable contemplation of the parties". The verb *to vitiate* means, in a context such as this "to destroy the force or legal effect of". The parties also agreed (in the fourth preamble) that the claimant had accepted a lower percentage share provided that its "initial expenses" were to be deducted before profit-sharing.

48.   In our view these provisions plainly mean that the parties were, in effect, starting again and that the past was to be taken as dealt with and compensated for, to the extent necessary, pursuant to the provisions of that addendum. If necessary we would hold that there was a waiver, but we think the true position is that the parties simply agreed that the claimant's losses to date, i.e. "initial set-up expenses" (which, we emphasise, would not have been payable at all under the 1999 agreement standing alone) should be paid first out of the proceeds of sale, and thus that they could have no further claim in respect thereof. If the claimant did not include the advances the subject of this claim when calculating its set-up expenses, then as Dr Berry agreed in cross-examination, that was its fault.

49.   Accordingly we conclude both as a matter of construction of the second addendum and on the evidence, that this claim has to fail, and we therefore dismiss it.

50.   **The claims – (2) Loss of profit and (3) damages for misrepresentation**

These claims, and the considerations underlying them, were at the heart of this arbitration. The first was put at the sum of =N=11,031 billion and was second in size only to the interest claim which was largely dependent on it. This was the amount

that, the claimant said, would have been its 30% share of the profits (after allowing for its initial set-up expenses) had 300,000 forms in fact been sold each year for three years after the second addendum. (We note here that the agreement referred to 100,000 Alien Registrations per annum in addition to the 300,000 Residence Permits. We are not concerned here with the Alien Registrations: whilst the claimant did not rule out any claim in respect of them, one was not being pursued at this stage.)

51.   When originally pleading its claim, the claimant said that the main basis of the contract was to register 300,000 expatriates per annum for three years. It there referred to the original agreement. Having heard all the evidence and read the documents put before us we are not persuaded that in 1999 there were any numerical expectations or representations made by either party. The number of 300,000 only came up, as we find, when the first addendum was being concluded.

52.   In an amendment which we allowed only towards the end of the hearing and after the evidence had been concluded, the claimant alleged that the figure of 300,000 "formed the main condition of the contract". It also pleaded that the respondents had represented to it that this would be the figure of "expatriates to be registered ... annually for three years" and that the respondents made that representation knowing it to be false or reckless or careless as to the truth or accuracy thereof, and that this induced the claimant to enter into the first and second addenda. Based on such alleged misrepresentation, the claimant also sought damages which, although said to be incapable of exact monetary quantification, ought to be – the claimant

suggested – of the order of =N=20 billion. It makes sense to deal with the misrepresentation claim first.

53. Counsel for the respondents not surprisingly opposed the proposed amendment when leave was sought to introduce it, not least on the basis that evidence had not been called in support of it and that he might want at least further to cross-examine one or more of the claimant's witnesses on the issue if the amendment were to be allowed. For our part we expressed reluctance to allow the amendment, not least because of the proposed plea that the claimant had been "fraudulently and/or negligently induced ... to enter into" the contract. In the course of exchanges with us counsel for the claimant confirmed that he was not alleging actual fraud (indeed, he could not do so in the absence of any supporting evidence), but was simply saying that a representation made recklessly, as he said this one was, is equivalent in law to one made fraudulently.

54. We ultimately allowed the amendment on that clear understanding, and on the basis that if in the course of our deliberations it seemed to us that the respondents were in any way prejudiced by the amendment, then we would give them a full opportunity to deal with the matter. We are happy to say that we do not need to call upon the respondents further on this point.

55. We reject the – fairly faint - suggestion by the respondents that the figure of 300,000 came from the claimant. Not only was there no real evidence to support that contention, but it is wholly unrealistic as a matter of inherent probability. The claimant would have no means of knowing – or even sensibly guessing at – the likely number of expatriates who would require

cards. All the information that might enable any such estimate was solely in the hands of the respondents. We have no doubt therefore that the figure came from the respondents. (In passing, we also reject the claimant's suggestion that they needed 300,000 cards to be produced in order to make the project viable.)

56. Equally, though, we have little doubt that 300,000 was a figure that was given in good faith. The respondents had information available from various sources that gave some indication, however rough, of the numbers likely to be involved. Further, given the introduction of democracy and the opening-up of the country they might reasonably have expected the numbers to increase over coming years. Certainly, the evidence we saw did not get near to satisfying us, on the balance of probabilities, that there was anything approaching carelessness, still less recklessness, in this regard.

57. More significantly in this respect, we saw no evidence that the claimant had suffered – as it alleged – any damage in terms of "putting the time, initiative, creativity and reputation of the claimant in jeopardy", or indeed any other damage that might be said to have resulted from misrepresentation, distinct from the damages claimed in other respects for breach of the term as to 300,000 permits. Thus any misrepresentation here could not have helped the claimant in any way. For these reasons the claim for =N=20 billion as damages for misrepresentation, introduced by the late amendment, must fail and is dismissed.

58. With that issue out of the way, we can return to the loss of profits claim. To a large extent this claim depends on the construction of the agreement and the addenda. Obviously, the

first addendum in particular is highly relevant.  We said earlier that, in some instances, preambles contained matters that were more properly to be regarded as questions of substantive agreement. This addendum provides some examples. We have already mentioned the first preamble which, it seems to us, clearly dealt with a substantive matter of agreement (namely the vitiation of the implementation of the 1999 agreement).  We think that the fourth and fifth preambles plainly contained further matters of substantive agreement.  The first is that the claimant's initial set-up expenses were to be deducted before the sharing of any profits, a matter not mentioned later in the part of the addendum in which one would have expected to find substantive matters.  The second is the fact that the claimant, in the fifth preamble, accepted a reduction in the duration of the contract subject to what appeared, as a matter of wording, to be two provisos.

59.  However, our view is that in the fifth preamble, just as in the fourth preamble, the words "provided however" are not in fact reflective of true provisos.   Rather, those words must mean something like "it is agreed" or "on the basis that" in both instances.  Taking the fourth preamble first, what follows those words is plainly not a proviso, but is an agreed *provision* to the effect that the claimant's set-up expenses would be deducted before the profit-sharing.  Similarly, the two apparent provisos in the fifth preamble are, in our opinion, clearly reflective of substantive and unconditional agreement by the parties in respect of the matters referred to.

60.  If support for this reading of the fifth preamble is required, it comes firstly from the point already made, that in the fourth preamble the words "provided however" cannot mean what they appear to mean.  Similarly, the second "proviso" in the fifth

preamble cannot properly be seen as such a term.  And, indeed, in fact it makes no sense to read the first so-called proviso in that preamble as being such, because it is unrealistic to imagine that the parties should have agreed that if the numbers set out were not reached, then the contract would revert to being one for five years.  If, as happened in fact, the numbers fell far short of the 300,000 mentioned, the claimant's share of the proceeds might be unrealistically low.  Indeed, it is not difficult to imagine a situation where, if the numbers were sufficiently low, it would take five, or even more, years for the claimants to recoup their set-up expenses.  Such a contract makes no sense, not only from the claimant's point of view, but in fact from that of both parties.

61.    Purely as a matter of construction, therefore, we conclude that it was a term of the first addendum and thus of the parties' contract as a whole (the first addendum – like the second – being an integral part of the agreement as a matter of its express terms) that there would be 300,000 Residence Permits and 200,000 Alien Registrations per annum. (At this point we observe that, during the hearing, nothing was said about the second figure, and we have therefore correspondingly confined our consideration to the question of numbers of Residence Permits. See also the parenthesis in paragraph 48 above.)

62.    It being expressly agreed that the projection in question was made by the Nigeria Immigration Service, that was plainly a contractual representation made on behalf of the respondents that was agreed to be part of the contract.  In his opening submissions, and following questions from the Tribunal, counsel for the claimant made it clear that his client was not claiming damages for misrepresentation as such, but rather was claiming damages for breach of contract.

63. Counsel for the respondents sought to rely upon the Entire Agreement Waiver clause contained in the 1999 agreement in order to say that any projection given by the respondents prior to the 1999 agreement (or, presumably, prior to the first addendum) could not affect the rights of the parties. However, we are not here dealing with a pre-contractual representation, but one given *in* a contractual document, and having regard to the express reference in the first addendum to the projection, the Entire Agreement Waiver clause can, obviously, have no effect in relation to it.

64. Indeed, since we have concluded that the projection was plainly a contractual provision, the earlier debate as to whether a representation was made and if so whether it was given in good faith or otherwise becomes irrelevant. So does the question when and how any such projection was made. Many of the respondents' submissions in closing were addressed to a case of misrepresentation. We do not think that we need to deal with those any further than we have done already for the reasons just given. The question is as to what the provisions of the parties' agreement were, and what the effect of those is.

65. In this respect, the respondents argued that the alteration in the term of years effected by the first addendum was a contingent condition, i.e. "a provision that on the happening of some uncertain event an obligation shall come into force, or that an obligation shall not come into force until such an event happens. In this latter case, the non-fulfillment of the condition gives no right of action for breach; it simply suspends the obligations of one or both of the parties." (*Chitty on Contracts*, 27th edition, paragraph 12-025.)

**66.** A contingent condition is to be contrasted with a promissory condition. The respondents placed reliance upon *Total Gas Marketing Limited v Arco British Limited* [1998] 2 Lloyd's Rep. 209, and the suggestion there that, if a condition of either kind is of fundamental importance, then the consequence of its failing may be that the contract comes to an end.

**67.** All this discussion, of course, depends on using the word "condition" in its most traditional sense, involving concepts of dependency, i.e. "but for" or "only because". We do not consider that the parties' contract was conditional in this sense. We draw a parallel, put to counsel for the respondents during his closing, with the case of a time charter for a ship which may provide, for example, for an "expected duration of 50/80 days". That will normally be accompanied by an expression of the charterers' intention, in general terms, as to the voyage or voyages to be performed. In such a case, if the charterer redelivers the ship either before 50 days or after 80 days, he is in breach of contract and must pay damages accordingly. Only if the words "without guarantee" are added (as sometimes happens) is the position different. Absent such words, there is deemed to be a contractual warranty given by the charterer that redelivery will take place within the time span expressed.

**68.** We still find that analogy to be valid. The Nigeria Immigration Service here projected that 300,000 Residence Permits would be issued per annum. That was set out in the first addendum, and on that basis the parties agreed terms as to how they would continue to perform the agreement, implementation of which had otherwise, as they agreed, been vitiated. We do not think it makes any difference whether, as the respondents argued, they could not know what the numbers would be. Nor does it make any difference that there was no express provision that the

numbers were guaranteed, any more than there is normally any provision as to such a guarantee in relation to the duration for a time charter for a ship, or in many other comparable cases.

69.  The respondents were not saying, in the first addendum, "We guarantee that there will be at least 300,000 Residence Permits each year": the parties were together saying that they would perform the contract, on the agreed terms, on the basis that there would be such a number, that figure having being provided by the respondents.  If they had not wanted the agreement to be entered into on that basis, then the respondents should not have proffered the projection in question, or should not have allowed it to be referred to in the addendum, or should have ensured that wording was used that made it clear that the consequences, if the figure was not met, were to be what they argued for in this arbitration.  They did none of those things, and in the light of our interpretation of the contract, we have come to the clear conclusion that they must be liable for the consequences of the projected figure not being met.

70.  This means that it is not necessary for us to consider whether or not the projection was a reasonable one at the time it was given, or what factors may have rendered it invalid even if it was appropriate at that time, or what steps the respondents took to ensure that all expatriates complied with the requirement to apply for CERPAC.  However, to deal with those points very briefly, we would just say that (as already indicated) we have no reason to believe that the original projection was given other than in good faith; but we can also see that there were factors that subsequently affected the situation and reduced the numbers of qualifying expatriates (though we do not think this can explain the whole discrepancy).  And we are

not satisfied, on such evidence as we have heard, that the respondents did not in fact do everything they reasonably could to ensure that there was maximum compliance with the requirements to obtain CERPAC.

71.  It follows that the respondents are liable to the claimant for damages for breach of the projection.  The aim of an award of such damages must be to put the claimant in the same position as it would have been in had the projection been met.  It is thus necessary to ask what would have happened if the contract had continued for three years and in each of those years there have been at least 300,000 Residence Permits.

72.  We pause here to deal with one point of importance. It is plain, and we find, that the parties agreed that the three-year period should start running only once the claimant had recovered its set-up expenses. That happened only at the end of 2004. Therefore the three-year period ran until the end of 2007. It was on that basis that the claims were advanced, and we have adopted the same premise throughout in reaching our decisions. We wish to make it clear that we express no view, and even less any conclusion, on the relationship between the parties, or their rights, during the post-2007 period. We were not asked to adjudicate on such matters, and we do not do so.

73.  The claimant said that it had lost profit amounting to =N=11.031 billion.  That was derived from a calculation which showed the revenue from the sale of 900,000 forms as being a total of =N=40.950 billion from which the claimant deducted the initial set up expenses of =N=4.180 billion, leaving a net projected revenue of =N=36.770 billion of which it was entitled to 30%, i.e. =N=11.031 billion.  In fact, it had only received =N=4.546 billion, inclusive of set up expenses.  Accordingly, it

claimed under this heading =N=10.665 billion made up as to =N=11.031 billion loss of profit plus =N=4.180 billion initial set-up expenses and less =N=4.546 billion revenue actually received.

74.  In addition, the claimant sought interest for loss of use of the money which if calculated it should have received. It put that interest at a total of =N=12.345 billion.

75.  *Mitigation:*      The respondents' principal answer to this claim appeared to be that the claimant had failed to mitigate its damages. The particular suggestion was that, having seen after one year that the sale of cards was running at only about 10% of the projected rate, the claimant should have stopped performance of the contract immediately and moved its resources into one of its other projected projects.

76.  The respondents did not plead a particularised case on mitigation. Nor was evidence adduced during the hearing in support of any particular case in this respect. Indeed, as regards the suggestion that the claimant should have moved its assets into other projects, it was made clear in the respondents' closing that there was, in the respondents' submission, no evidence to support the proposition that the claimant actually had contracts in other countries that it could have implemented.

77.  The duty of a claimant in circumstances such as prevailed here is only to act reasonably. We think that, faced with a first year's bad results, the claimant was perfectly entitled to go on in the hope that things would improve in the second year, and that by the time that ended it was too late to do anything to reduce losses. In any event, the respondents have not satisfied us on the balance of probabilities that the claimant did not act reasonably, and so this argument must fail.

78. **Quantum:** The respondents did not challenge the claimant's calculation on its principles – not surprisingly, since in our view it is a self-evidently correct one – but did dispute the rate of exchange used, =N=130/$1. However, the evidence before us suggested, and we find, that this was a perfectly appropriate figure as an average for the period in question. Accordingly we have accepted the claimant's calculation and awarded it =N=10.665 billion as claimed.

79. **Interest:**  We turn next to consider interest on this claim. The claimant said, and we think it indisputable, that the value of money involves a time factor. Put another way, a party that is deprived of money that it should have had at a particular time also suffers because it has not had the use of that money during the period it has been withheld. It is only right that compensation for that loss of use should be awarded when the deprival arises from a breach of contract or failure to pay a debt punctually. And interest is the normal way in which such compensation is measured, on the notion that the deprived party may have had to borrow to cover the fact that it did not have its money timeously, or at the very least has lost the opportunity to invest or deposit the money in question, and thus to earn interest upon it.

80. So much is, as we have said, beyond argument and indeed the contrary was not argued. What the respondents did say, however was, firstly, that any damages by way of interest should be measured not on the basis of the wrong projections but on the basis of earnings that the claimant could legitimately have acquired as a result of the use of its capital and time during the period in question; secondly, that the claimant's figures were unreliable not least because the rates used by the claimant were wrong, and because no account had been taken in

its calculation of payments made in 2005 and 2007; and thirdly that there was no evidence to show what earnings the claimant could have achieved if paid earlier – on the contrary, the evidence suggested that the claimant could not have earned anything without this project and thus there was no justification for a claim for loss of opportunity to use the money claimed. We take each argument in turn.

81.    We are not sure that we understand the first point. We think that the earnings that the claimant could legitimately have acquired as a result of the use of its capital and time during the period in question, to use the respondents' phrase, can only be measured by looking at the money of which they were deprived, and that in turn can only be ascertained by reference to the shortfall between the contractual projection and the figures actually realised.

82.    The third point also seems to us not to get the respondents anywhere. It is nothing to the point that the claimant might, but for this agreement, have had no business and no earnings. The fact is that, on our findings, the claimant was entitled to expect a substantial profit under this agreement, and had that been realised the claimant would have been able to use that profit either to pay off any loans needed to finance the business or to invest, or some combination of the two. So the claimant has plainly suffered a loss as a result of being deprived of the timely payment of what it was legitimately entitled to expect to be receiving under the agreement.

83.    There is, however, something in certain aspects of the second argument. It was suggested that Dr Berry had exaggerated the rates of interest over the relevant period, but whether or not that is the case does not seem relevant to us: what matters is

what in fact the right rates were. That gives rise to a question as to whether regard should be had to deposit rates or lending rates, the latter commonly being about 6 points higher than the former, and in one year (2001) almost 16 points higher (and this on the respondents' own evidence). The respondents, in counterclaiming, sought only simple interest at a rate of 12% p.a. (clearly basing themselves on deposit rates) whereas the claimant, who obviously preferred lending rates, asked for 18%, i.e. a figure related more closely to the lending rates.

84.   We do not know whether the respondents' approach was a ploy, perhaps based on an expectation that they might ultimately have liability to the claimant and the fact that their counterclaim was considerably less than the claim, and thus it might be politic to advance a more modest interest claim than otherwise might have been the case; or whether it reflected their genuine view as to interest entitlement. Whichever is the case, our approach is that in commercial matters, the normal reasonable expectation is that – as indeed happened here – a party will largely borrow to finance its business, and therefore compensation for loss of use of money is more appropriately measured by reference to lending rates.

85.   This is not just our view: it is, in our experience, the approach taken as a general rule in international arbitration and in other jurisdictions. Taking that approach, and having regard to the evidence on rates provided by the respondents themselves, we have no hesitation in concluding that the claimant's figure of 18% is quite appropriate. How it should be applied, however, is another matter.

86.   We think the right way to award interest here is very much as the claimant pleaded its claim, i.e. by taking the amount it

should have received each year from 2002 to 2005, running interest on that and then adding such interest to the amount that should have been received in the following year, i.e. compounding the interest with the principal that remained unpaid. In calculating that principal it is appropriate to deduct, as the claimant did in its calculations, the deductions towards set-up expenses that would have been made before its 30% share was calculated. Having done our own calculation, it seems to us that if anything the claimant's claim was perhaps understated. We have therefore allowed the claim in full at =N=12.345 billion.

87.  **The claims – (4) Borrowing costs**

The claimant advanced a separate claim for interest on borrowings it had allegedly had to make because of the failure of the projection of 300,000 Residence Permits, contending that it had to pay interest/penalties on its borrowings totalling =N=1.356 billion of which it said it had recovered =N=490 million, leaving a claim of =N=866 million.

88.  The respondents said that this claim was unsustainable for a number of reasons. In the first place, they said, any loss arose because the claimant did not use its own resources to fund the contract, but they should not be liable for that decision. Secondly, if there was any liability it was already built into the set-up costs, which have been paid. Thirdly, the claimant's figures were conflicting and its accounts misrepresented the position. Fourthly (we summarise) the evidence did not show the loans relied upon.

89.  We do not accept the first of these reasons. Had the respondents not been in breach of contract as already identified, not only would the claimant have received the sum referred to in

paragraph 76 above promptly, but it would not have had to borrow in order to run the operation. Similarly, we do not see how the second reason can be good. There is nothing to suggest that any interest provision was to be included in set-up costs. Dealing briefly with the third and fourth reasons, it is true that in some respects the claimant's evidence was less than satisfactory. For instance, there was no solid evidence at all to support that part of this claim that was said to arise as a result of foreign borrowings (at an alleged rate of 25% p.a.) and in these circumstances we felt quite unable to allow anything in that respect.

90.  On the other hand, it is quite plain to us that the claimant had to borrow to fund the costs of operating the scheme (costs with which we deal below, but in respect of which it should be noted no separate claim for interest was advanced). Given the evidence we had, and the fact that we accept there were foreign borrowings, although we cannot say to what extent nor what interest on them may have been paid, it seems to us appropriate to accept that the Afribank borrowings contended for were indeed made. They gave rise to a claim for interest of =N=742,402,776 over the years up to 2007 less =N=490,933,568.52 million, i.e. =N=251,469,207.48, and we have awarded that sum.

91.  *The claims – (5) Operational expenses*

The last of the claimant's claims was for =N=6.670 billion in respect of operational expenses. It will be recalled that, in the original agreement, the payment conditions included a provision that the revenue from the fees payable for CERPAC cards should be split three ways, with "10% to the designated account of the Ministry as operating costs". No definition of

such costs was provided; neither was there any explanation as to how the monies in question were ultimately to be dealt with. However, the Ministry did undertake in that agreement to provide accommodation and vehicles.

92. By the time of the first addendum, it had been agreed that the revenue – after deducting "cost" was to be shared on a different basis, but still with "10% being operating expenses to the Ministry." It was clear from other provisions of the addendum that the claimant was responsible for the technical performance of the agreement until handover to the respondents, and that it was for the claimant to provide accommodation and vehicles.

93. The claimant maintained that this provision for 10% operating expenses was in fact to cover its expenses in operating the contract. It said that, since inception, there had been no year in which the projected 10% had been realised, yet the claimant had, it said, to run the project continuously. It contended that between 2002 and 2007 the sum of =N=8.190 billion was due in respect of operational expenses, against which it gave credit for =N=1.430 billion received from the respondents, leaving a balance of =N= 6.760 billion which it claimed.

94. This claim was based on the assumption that 300,000 cards would have been sold for each of the years 2002-2007 producing, in each of those years, revenue of =N=13.650 billion, of which 10% was =N=1.365 billion. For six years that gives a total of =N=8.190 billion.

95. The respondents said that the 10% was not for the operation of the scheme, but was for the benefit of the respondents, although under a "new understanding" with the claimant (since 2005) the respondents had been paying the 10% to the claimant.

96.   According to the respondents, because the contract was for a
      "BOOT" ("Build, Own, Operate and Transfer") project – as was
      the case – and because the claimant was not mentioned in the
      agreement as being entitled to the 10%, it had no claim in that
      respect.  It is, the respondents said, wholly inconsistent with the
      nature of a BOOT contract that the contractor should be entitled
      to operating expenses.   We do not follow that argument:   It
      seems to us that it is up to the parties to any particular contract
      to agree on such matters, and that there is nothing inconsistent
      with the nature of such a contract that the contractor should be
      entitled to have its operational or running expenses paid by the
      employer.

97.   It is, of course, right that there is no express agreement to be
      found in the contractual documentation to explain what is to
      happen to the 10%.  Thus, it falls to us to interpret the parties'
      agreement (including the addenda) in order to ascertain what
      they must be taken to have intended.

98.   We look at the matter in this way.  "Operational expenses" are
      plainly those expenses incurred in the daily running or operation
      of the project.   Under the first addendum, it fell to the claimant
      to provide accommodation and vehicles, both of which involved
      continuous expenditure.  And under the 1999 agreement alone,
      before the first addendum was agreed, it was clearly for the
      claimant to run the project in other respects, again therefore
      inevitably incurring running expenditure as it did so.   The
      respondents,   on   the   other   hand,   had   no   such   current
      expenditure  in  connection  with  the  project  after  the  first
      addendum was agreed.  There must, therefore, be a very strong
      presumption that the 10% was, at least from the date of the
      first addendum, being earmarked for the claimant.

99. If we ask ourselves why was it to be paid into an account of the respondents, we think the answer is clear: if it had been paid directly to the government with the 60% share, it would have been extremely difficult subsequently to seek to recover it. On the other hand, at least when the agreement was entered into, it was perhaps not clear to the parties to what extent either of them would be bearing operational expenses, and so it made sense to have a separate deposit for that purpose which could be apportioned subsequently. Once the first addendum had been signed, however, there was no longer any question of apportionment: the claimant alone was going to incur the expenses in question.

100. The respondents also said that, even if the claimant had an entitlement to the operating expenses, the claimant had to prove what those expenses were: it was not simply entitled to 10%. And since the claimant had not adduced any evidence to show what its actual expenses were, its claim had to fail.

101. Against this background, it seems to us that two threshold questions arise. Firstly, do the claimants have any entitlement at all in respect of operational expenses? Secondly, if they do, are they entitled to the full 10%, or only to such expenses as they can prove?

102. On the first point, there can in our opinion be no doubt that the intention behind the relevant provisions in the agreement and the first addendum was to ensure that 10% of the revenue should be set aside to cover operational expenses. That would make no sense unless those expenses were to be paid to whoever incurred them. In the result, once implementation of the agreement started following the agreement of the first addendum, that was the claimant. As a matter of necessary

implication, therefore, the claimant must be entitled to operational expenses.

103. Is it then entitled to the whole 10%, or only to such expenses as it can prove?  If the latter, we accept - as the respondents argued - that the claimant must fail for want of evidence.  This is not such an easy question to answer because there are weighty considerations in respect of both possible views.   However, having considered the matter carefully, we are satisfied on balance that the intention to be imputed to the parties was that 10% of the revenue should be paid to the claimant to cover its operational expenses, without proof of the actual expenses being required.  We think that, if the parties had intended that the claimant should be required to prove its expenses, something would have been said in either the agreement or the addendum to that effect.   Further, it makes absolute sense for parties in a complicated commercial relationship like this to liquidate, where they can, the amount of certain liabilities such as running expenses, and we consider that is what happened here.

104. We also observe that the parties themselves seemed to have thought that this was the way in which the agreement and addenda should be interpreted. After 2005 when there was, the respondents said, a "new understanding between the parties" the claimant was paid the 10% without proof of expenditure. And in fact, there were earlier payments on that basis, and in a memorandum written in October 2007 by the Ministry's Director of Finance and Accounts, it was clearly said that the 10% operational expenses "is for the management of the project. Currently it is payable to the [claimant]" who was still running the project until the respondents could take it over. It is also perhaps not without significance that in the respondents'

Defence and Counterclaim in these proceedings it was averred that the burden of operating the scheme had always been on the claimant; and a reference was made to there being "no change in the obligations of the claimant to bear the operational expenses". If the claimant was to bear them, surely it was entitled to recover them.

105. For these brief reasons, we conclude that the claim for =N=6.760 billion under this heading succeeds. We note here, as already indicated, that interest was not claimed on this amount as, in his closing, counsel for the claimant expressly made clear.

106. A few general comments on the claimant's claims can conclude this section of our Award. In the first place, we have not decided anything in relation to the post-2007 period (see paragraph 72 above). How the parties have treated with one another since then, and any disputes that have arisen between them concerning the subsequent period, are not matters that concern us in this Award.

107. Secondly, in its amended Reply the claimant sought various declarations. These we have dealt with, as seems to us appropriate, in the dispositive part of our Award below. They follow from the decisions made herein.

108. Next, the claimant made various allegations that the respondents had frustrated the implementation of the scheme and had harassed the claimant. Complaint was also made about a suspension of sales of forms in 2005. The claimant further said that the respondents had later allowed banks other than Afribank to sell forms. That was not itself a breach of contract; and we do not see that any loss flowed from it. Generally, though, since no claims were advanced based on these allegations, we see no need to deal with the points further, and

thus say nothing about them beyond what we say in paragraph 135.

109. Similarly, we pass over suggestions made by the respondents but not pursued vigorously at the hearing, that the claimant was in breach in that production of cards was "epileptic" and slow, and that not all security details were captured on the cards. Not only were these matters not seriously followed up, but we cannot find that there was any breach in respect of them, and in any event it was not said that any damages flowed from them. With those observations, we have dealt with the claimant's affirmative case, and we can now turn to consider the counterclaims.

110. *The counterclaims – (1) Equipment*

The respondents said that, under the agreement and the addenda the claimant was to provide various items of equipment for which it had been paid, although in fact it failed to provide some of those items.  Consequently the respondents claimed =N=307.1 million.  This was said to be the value of ten generators, five pickup trucks, one split air conditioner, seven Peugeot 504 air-conditioned vehicles, eight four-wheel drive vehicles, one training centre and sundry items of computer hardware and software.

111. The real dispute in respect of this counterclaim was whether the claimant had provided all the equipment it was contractually due to provide, and if not, to what extent there was a shortfall.  The respondents said that we should take a report of a Verification Committee of March, 2005 as evidencing what had not been supplied.  That, the respondents said, had been agreed to by the claimant as indicating what items were outstanding.  However, there was an addendum to that report, relating to computer

systems, which showed that the cost of items actually supplied was considerably higher than it had been put in the report itself, but at the same time the cost of systems items not supplied was reduced from =N=616.4 million to =N=85.5 million, to some extent because credit was given for items over-supplied. Nothing, however, was said in the addendum about the other items of equipment (not included under the heading of "computer hardware and software" above), and in the original report itself whilst those items were mentioned, no value was put upon them.

112. The evidence was not entirely satisfactory on this matter. There clearly were some items that were not delivered by the claimant, in breach of contract. Equally there were certain items, other than computer hardware and software, which had been supplied in excess of the claimant's contractual obligations. We remind ourselves that the burden of proof is here on the respondents, since it it their counterclaim with which we are dealing.

113. Firstly, we do not think the respondents are entitled to recover the =N=133 million claimed in respect of what was said to be the missing training centre. A report written, according to Dr Berry, in 2004 by the claimant and given to the respondents referred to the establishment of a training centre and – in detail – to training. There was nothing to indicate that the respondents objected to that report or disputed its contents. Further, we saw a Ministry report which freely interchanged "centre" and "school" (thus suggesting some confusion on the respondents' side) and supported the view that a centre existed. Assessing the evidence we heard, we have concluded that the claimant in fact provided a training centre, sufficient at least to satisfy its obligations under the contract.

114. Secondly, in relation to the Peugeot 504 vehicles, the complaint was simply that those that were provided did not have air conditioning, whereas the claim was in respect of the total value of seven such vehicles. That cannot be right. Doing the best we can in the absence of any really solid evidence, we assess the respondents' entitlement under this head at =N=5 million.

115. Thirdly, we are satisfied that the claimant failed to deliver eight 4-wheel drive vehicles as, indeed, was conceded. We also find a failure to provide two generators (but not the 10 claimed for). Otherwise this counterclaim is not proved to our satisfaction and therefore fails.

116. For the items under this heading in respect of which we find the respondents entitled to succeed we have allowed a total sum of =N= 43 million.

117. **The counterclaims – (2) Taxes, levies and charges**

The respondents said that the claimant had not paid the =N=1,100 per card provided for in the tripartite agreement: "the company's fee of =N=11,100 ... less deduction for taxes levies and charges being =N=1,100 for each CERPAC card".

118. As the respondents demonstrated in their submissions, contrary to Mr Reddy's evidence, no deduction had been made from payments to the claimant to cover "taxes levies and charges". The claimant's response was to say that it was clear that Afribank had been paying "on behalf of both parties", that taxes were payable by the parties selling the form, namely Afribank, and that the Federal Inland Revenue had never written to the claimant demanding any amounts in this respect.

119. With respect to the claimant, these arguments seem to us to be nothing to the point. What the claimant was entitled to have was its share of the revenue, less =N=1,100 (revised in early 2007, as between Afribank and the respondents, at least to =N=2,500) per form sold. In fact that deduction was not made. That Afribank effectively reimbursed itself must simply have meant that the respondents were deprived of =N=1,100 per form which they were otherwise entitled to have. In our view, the claimant is plainly responsible to reimburse the excess income received in this respect, the sum in question being =N=243.72 million.

120. *The counterclaims – (3) Failure to train personnel*

The respondents contended that the claimant was in breach of obligations under the agreement satisfactorily to train officials of the Nigeria Immigration Service in the use of the scheme and its related technology. The contention was that the claimant had, rather than training officials from the Service, continued to employ its own staff for its core operations. The respondents said that the cost of training the officials in question, which they claimed, was =N=2 billion.

121. It is right, straight away, to observe that there was no evidential support whatsoever for this, or indeed any other, figure by way of damages. That alone would be, in our view, a reason for dismissing this counterclaim.

122. However, the situation goes further than that. The claimant maintained that it had in fact trained a large number of officials up to the level at which they could adequately be trained, and that the respondents had failed to provide sufficiently qualified individuals for training at higher levels, at least until late in the

43

day. There was, we must say, a good deal of documentary evidence in support of this position.

123. It is plain to us that there was a good deal of exaggeration in the respondents' case on this aspect of the matter, and not only in relation to the sum of =N=2 billion.   Clearly, a not insubstantial number of officials of the Service were given training.   The respondents did not show, on evidence, that this was not the case.   Nor did they show that any such training was inadequate.   However, they sought to extrapolate from one piece of evidence the proposition that all the training was useless.

124. That evidence was given by Mr Aliyu, who was in fact the single person being trained to take over and run the whole project when it was handed over to the Service.   We ultimately found it difficult to make much of Mr Aliyu's evidence, helpful though he was trying to be.   A lot of what he said was unsupported by other witnesses or by documentation, and appeared to be argumentative.   This view was reinforced by a document that he took with him to the witness table and which, on our prompting, was disclosed: a note he had written alleging all kinds of deficiencies which seemed to indicate a desire to denigrate the whole scheme in any way possible, but which were generally not supported elsewhere in the evidence.

125. Mr Aliyu was undoubtedly doing his best on behalf of the respondents, but given the inconsistencies in his evidence and the lack of corroboration, we felt that we had to guide ourselves by reference to other elements of proof.

126. The burden was upon the respondents to support their allegations, as counterclaimants, and we concluded that they failed in this respect as regards both liability and quantum.

**127. *The counterclaims – (4) Overpayments***

The respondents contended that they were entitled to set off against any liability they might have to the claimant various sums which they said had been overpaid inadvertently, namely =N=74.853 million in respect of software licensing fees, =N=490.93 million paid in respect of import duty, =N=150 million paid without any contractual basis, =N=137.360 million being an overpayment in respect of the set-up expenses and =N=103 million paid in respect of an allegedly unauthorised loan reimbursement. These amounts were said, in the respondents' pleading to total =N=955.3 million, but it seems to us that this total is incorrect.

**128.** As regards the software licensing fees in the sum of =N=74.853 million, whilst we reject the respondents' submission that because the specification appended to the first addendum referred to three-year warranties in relation to the software, therefore the costs should all be regarded as included in the set-up costs, it seems to us nonetheless that software licensing fees must properly be regarded as operating expenses, and therefore covered by the 10% to which we have already concluded the claimant is entitled. On this basis the claimant would be unjustly enriched by receiving both the 10% operating expenses *and* anything in respect of software licensing fees during the period in question. As the respondents argued, it must be against all good conscience that the claimant should be entitled to keep this excess payment, the respondents having received no value for it whatsoever, and there can be no doubt that the respondents are entitled to recover it, and thus to succeed in respect of this head of this part of their counterclaims.

**129.** As to the import duty of =N=490.93 million, the respondents'
position was that they had not authorised that payment, and
that the claimant was not entitled to be reimbursed in respect of
it under the agreement in any event. We cannot accept that
Afribank would simply have paid the amount in question to the
claimant upon its demand (which Dr Berry admitted had been
made) without express authorisation from the respondents, as
the bank was operating an account that was in the respondents'
name. It is, of course, correct that there is no reference in the
agreement to import duties, any more than there is in respect of
the =N=103 million paid in respect of an allegedly unauthorised
loan reimbursement. However, we cannot tell on the evidence
before us on what basis the respondents authorised these
payments, as we conclude they must have done. The mere fact
that they may have been extra-contractual could not mean that
the respondents are entitled to recover them. Indeed, in the
absence of any evidence from the respondents as to the basis
upon which these payments were made, we cannot infer that
they were made by mistake. There is every possibility that they
were quite properly made under the 1999 agreement's provision
for the sharing of "all withholding taxes VAT fees levies and
other relevant charges". For all these reasons, the counterclaims
in respect of them cannot succeed. And the same goes for the
=N=150 million allegedly paid without any contractual basis.

**130.** We referred above to the suggestion by the respondents (which
we rejected) that Afribank might have paid sums to the claimant
simply upon its request, without government approval. We
should also mention here a suggestion by the respondents that
the claimant somehow opened an account at Afribank in the
respondents' name, and thus was able to control what happened
to the funds in that account. That is a wholly unrealistic

46

suggestion as a matter of inherent probability; it was totally unsupported by evidence, and we reject it.

**131.** That leaves the counterclaim for =N=137.360 million in respect of an alleged overpayment on the original set-up expenses. This counterclaim arose because the respondents said that the items to be supplied and covered by the set-up expenses to be paid to the claimant were valued at a figure of =N=3,019,094,500, whereas what was actually paid to the claimant was =N=137.360 million more than that.

**132.** The problem arose in the following way. In the appendix to the first addendum, i.e. the specification of the works, was a summary sheet showing set-up costs at a total of =N=276 billion. That summary reflected the sub-totals that had appeared earlier in the specification. However, Mr Reddy maintained that the subtotals were not all correct, and that in a meeting with the respondents this was clarified and it was agreed that the correct total was =N=3,156,494,500.

**133.** It was on that basis that payment was made to the claimant. That such agreement seems to have been reached was in fact recorded in the second addendum when it was agreed that in consideration of the supply of extra items and facilities, the contract price of the project was =N=4,179,994,500 "from the earlier contract price of =N=3,156,494,500 as a result of the extra items and facilities supplied by the [claimant] totaling =N=1,023,500,000." In these circumstances, we feel bound to accept that there was no overpayment and that accordingly this part of the counterclaim must fail.

**134.** At this juncture we should mention one point argued, though not particularly forcefully, for the respondents, namely that payments by the Federal Government need the approval of the

47

Federal Executive Council, and there was no evidence that this had been given. This point was taken particularly in relation to the alleged overpayment just dealt with. We do not see that there is anything in this argument. The question of any such approval as may be necessary is not something that the claimant could or would be privy to: it is an internal question for the government alone. If payments are made by a government a claimant in the position of this claimant, in a commercial relationship with that government, must be entitled to assume that any necessary approval has been given, and cannot be liable to refund any monies that may be paid if that is not the case. In any event it would have been for the respondents to show the absence of approval, which they singularly failed to do.

135. We would also mention that this was a purely commercial transaction in relation to which the parties signed commercial contracts. There was no evidence – indeed there were not even any allegations – before us to justify the invitation that was apparently issued to the Economic and Financial Crimes Commission to pursue the claimant in respect of these matters. Whilst we can make no finding on the point, we can see that an objective observer might reasonably form the view in the circumstances that the claimant was being harassed.

136. Accordingly, we find that the claimants are entitled to an award for the sum of =N=29,660,166,207.48, calculated as follows: =N=10.665 billion (paragraph 78), plus =N=12.345 billion (paragraph 86), plus =N=251,469,207.48 (paragraph 90) and =N=6.760 billion (paragraph 105) LESS =N=43,000,000 (paragraph 116), =N=243,720,000 (paragraph 119) and =N=74,583,000 (paragraph 128).

137. The claimant has been broadly successful, although certain of its claims failed and some of the counterclaims succeeded. The claimant's failures were largely in respect of matters that did not consume a huge amount of time or effort at the hearing or in preparation for it. Nonetheless, we do not think it right to award the claimant the whole of its costs, and have instead given it 90% of what we consider is a reasonable sum in respect of its costs, and directed that it should also bear 5% of the costs of the Award.

138. As to the quantum of the claimant's costs (put at a total of US$591,622 – in contrast to the respondents' costs claim which was made up of legal fees and expenses of =N=150,300,000, plus other expenses of =N=20,742,267, or approximately US$1,447,000), we thought that too much was claimed by way of *per diem* for its witnesses, both as to amount and as to number of days. We also found the claim for London accommodation substantially exaggerated as to its period. We accordingly allowed only US$45,000 in respect of items 1-6 on the claimant's costs schedule. Item 8, deposits in respect of arbitrators' fees, we deal with as part of the costs of the Award. As to item 7, the claimant's lawyer's charges, we allowed these in full at $230,000, that figure appearing to us reasonable in view of the size of the case, the work involved and the amount claimed for the respondents' lawyers' fees. Accordingly we assessed the claimant's recoverable costs in the gross sum of $275,000, of which the 90% to be paid by the respondents is $247,500.

**139. WE THE UNDERSIGNED ARBITRATORS NOW THEREFORE AWARD AND ADJUDGE:**

1) **THAT** the claimant's claims succeed in the total sum of =N=30,021,469,207.48 and that the respondents' counterclaims succeed in the total sum of =N=361,303,000 and that there is accordingly a balance due from the respondents to the claimant of =N=29,660,166,207.48.

2) **THAT** the respondents shall therefore within 14 days of delivery of this Award pay to the claimant the sum of =N=29,660,166,207.48.

3) **THAT** the respondents shall bear and pay their own costs and shall further pay to the claimant within 14 days of delivery hereof US$247,500 in respect of the claimant's costs, **AND** that the claimant shall bear and pay 5% and the respondents shall bear and pay 95% of the costs hereof, which we hereby fix in the total sum of Sterling £253,467.20 (being made up as to £75,400 fees and £10,416.60 expenses for Chief Assam, £56,950 fees for Mr Zaiwalla and £78,430 fees for Mr Harris, £26,705.47 hearing room charges, £4,673.46 (being Value Added Tax on such hearing room changes), and £891.67 being the charges of the LCIA for holding and managing arbitrators' fee deposits) **PROVIDED** that to the extent that the claimant has paid more than its 5% share hereof, it shall be entitled to be reimbursed by the respondents within 14 days of the delivery hereof.

**140. WE FURTHER ADJUDGE AND DECLARE:**

1) **THAT** annual software licensing fees are an integral part of the operating expenses for which the claimant is entitled to be reimbursed, and that accordingly the claimant is entitled to

retain and the respondents are not entitled to recover the sum of =N=731,400,000 paid to the claimant in this respect for 2005 and 2006.

2)      **THAT** the claimants' entitlement in respect of their claims and the respondents' entitlement in respect of their counterclaims is as set out heretofore and that otherwise the claims and counterclaims fail and are dismissed.

**GIVEN UNDER OUR HANDS** this 14ª day of August 2008

Sarosh Zaiwalla                         (Jo-Anna Elizabeth Mills)
                                        Witness

Chief Assam E. Assam, SAN              (Jo-Anna Elizabeth Mills)
                                        Witness

Bruce Harris                           (Jo-Anna Elizabeth Mills)
                                        Witness

51

**IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT 1990**
**CHAPTER A18 of LAWS OF THE FEDERATION OF NIGERIA 2004**

**AND**

**IN THE MATTER OF AN ARBITRATION**

**BETWEEN:**


CONTINENTAL TRANSFERT TECHNIQUE LIMITED

<u>Claimant</u>

and


1)   FEDERAL GOVERNMENT OF NIGERIA
2)   ATTORNEY GENERAL OF THE FEDERATION
3)   MINISTER OF THE INTERIOR

<u>Respondents</u>




**<u>"CERPAC" Agreement dated 25 May 1999 (as amended)</u>**



**<u>FINAL AWARD</u>**