UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>CONTINENTAL TRANSFERT )<br>TECHNIQUE, LIMITED, )<br> )<br>     Plaintiff, )<br> )<br>     v. )<br> )<br>THE FEDERAL GOVERNMENT OF )<br>NIGERIA, ATTORNEY GENERAL OF )<br>THE FEDERATION, and MINISTER OF )<br>THE INTERIOR, )<br> )<br>     Defendants. )<br>_____) | Civil Action. No. 08-2026 (PLF) |

<u>OPINION</u>

     Pending before the Court is a motion from plaintiff Continental Transfert

Technique, Limited ("Continental") for a writ of attachment [Dkt. Nos. 123 (sealed) and 134

(redacted)] seeking to attach a bank account registered to the Central Bank of Nigeria ("CBN")

at JPMorgan Chase Bank in New York.  Also pending before the Court are a motion filed by

CBN seeking leave to intervene in this matter and to file an opposition to Continental's motion

for writ of attachment [Dkt. Nos. 126-1 (sealed) and 137 (redacted)], as well as CBN's motion

for leave to file a surreply to Continental's motion for writ of attachment [Dkt. Nos. 138 (sealed)

and 139 (redacted)].  Defendants – the Federal Government of Nigeria ("FGN"), the Attorney

General of the Federation, and the Minister of the Interior – have not responded to any of these

motions.  Continental does not oppose CBN's motion for leave to intervene, but does oppose

CBN's motion for leave to file a surreply.

Upon careful consideration of the briefs, the relevant authorities, and the extensive record in this case, the Court will grant CBN's motion for leave to intervene and to file an opposition to the motion for writ of attachment [Dkt. Nos. 126-1 (sealed) and 137 (redacted)]; the Court will accept CBN's opposition [Dkt. Nos. 126-2 (sealed) and 137-1 (redacted)] as filed.[1] The Court will also grant CBN's motion for leave to file a surreply [Dkt. Nos. 138 (sealed) and 139 (redacted)], and will accept as filed CBN's surreply [Dkt. Nos. 138-2 (sealed) and 139-2 (redacted)], Continental's opposition to the motion for leave to file a surreply and proposed response to the surreply [Dkt. Nos. 140 (sealed) and 141 (redacted)], and CBN's reply in support of its motion to file a surreply [Dkt. Nos. 142 (sealed) and 143 (redacted)]. The Court will deny Continental's motion for writ of attachment [Dkt. Nos. 123 (sealed) and 134 (redacted)]. A separate order giving effect to this opinion will issue this same day.

---

[1]  The Court considered the following documents and accompanying attachments and exhibits in resolving the pending motions: Continental's Memorandum in Support of its Motion for Writ of Attachment ("Mot.") [Dkt. No. 123-1 (sealed) and Dkt. No. 134-1 (redacted)]; CBN's Memorandum in Support of its Motion for Leave to Intervene in Opposition to Continental's Motion for Attachment ("Mot. Intervene") [Dkt. No. 126-1 (sealed) and Dkt. No. 137 (redacted)]; CBN's Memorandum in Opposition to Continental's Motion for Writ of Attachment ("Opp'n") [Dkt. No. 126-2 (sealed) and Dkt. No. 137-1 (redacted)]; Continental's Reply Memorandum in Support of Writ of Attachment ("Reply") [Dkt. No. 132 (sealed) and Dkt. No. 135 (redacted)]; CBN's Motion for Leave to File Surreply ("Surreply Mot.") [Dkt. No. 138 (sealed) and Dkt. No. 139 (redacted)]; CBN's Surreply in Opposition to Writ of Attachment ("Surreply") [Dkt. No. 138-2 (sealed) and Dkt. No. 139-2 (redacted)]; Continental's Opposition to the Motion for Leave to File Surreply ("Surreply Mot. Opp'n") [Dkt. No. 140 (sealed) and Dkt. No. 141 (redacted)]; Continental's Response to CBN's Surreply ("Surreply Response") [Dkt. No. 140, Ex. A (sealed) and Dkt. No. 141, Ex. A (redacted)]; and CBN's Reply in Support of Motion for Leave to File Surreply ("Surreply Mot. Reply") [Dkt. No. 142 (sealed) and Dkt. No. 143 (redacted)].

# I. BACKGROUND

## *A. Factual and Procedural Background*

The Court has discussed the lengthy and complex history of this case in earlier opinions in this matter, and there is no need to repeat it here. See Cont'l Transfert Technique Ltd. V. Fed. Gov't of Nigeria, 697 F. Supp. 2d 46 (D.D.C. 2011) (denying Continental's motion for default judgment and Nigeria's motion to dismiss); Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria, 800 F. Supp. 2d 161 (D.D.C. 2011) (granting Continental's motion for summary judgment). The instant motions concern Continental's attempts to obtain a writ of attachment on a bank account to satisfy this Court's judgment confirming a substantial arbitral award in favor of Continental against the Federal Government of Nigeria. The Central Bank of Nigeria – which has not previously been involved in this litigation – opposes Continental's motion for writ of attachment and claims to own the bank account that is the subject of the motion.

Continental initiated arbitration proceedings in the United Kingdom against FGN in November of 2007, alleging that FGN failed to meet its obligations to Continental under a 1999 commercial contract. In August of 2008, the U.K. arbitral tribunal issued an award requiring FGN to pay substantial damages and interest to Continental. CBN was not a party to the underlying contract or the arbitration. In November of 2008, Continental filed this lawsuit seeking confirmation of the August 2008 arbitral award under the Federal Arbitration Act, 9 U.S.C. §§ 201-08.[2] When FGN failed to respond to the complaint, Continental sought and

---

[2]     In November of 2009, Continental filed an amended complaint with a second claim that offered an alternative basis for this Court to confirm the U.K. arbitral award. See Dkt. No. 31. In the second claim, Continental sought enforcement of a June 2009 default judgment pursuant to the Uniform Foreign-Money Judgments Recognition Act from a U.K. court that had

obtained an entry of default from the Clerk of Court in February of 2009. See Affidavit for Default, Dkt. No. 8; Default, Dkt. No. 9. Immediately thereafter, Continental filed a motion for default judgment. See Dkt. No. 10.

The motion for default judgment prompted counsel for FGN to enter an appearance in May of 2009, and thereafter to file a motion to vacate the default and dismiss the complaint. See Dkt. No. 24. In March 2010, this Court vacated the entry of default and denied Continental's motion for default judgment, but also denied Nigeria's motion to dismiss. See Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria, 697 F. Supp. 2d 46. Shortly thereafter, Nigeria filed an answer to the amended complaint, see Dkt. No. 39, and Continental moved for summary judgment. See Dkt. No. 40. The Court granted Continental's motion for summary judgment in August 2011. See Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria, 800 F. Supp. 2d 161. Following supplementary briefing on how to calculate the amount of the award in U.S. dollars, this Court entered an Amended Order and Judgment in March 2013 requiring FGN to pay Continental $276,111,640 plus post-judgment interest. See Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria, 932 F. Supp. 2d 153 (D.D.C. 2013). The U.S. Court of Appeals for the District of Columbia Circuit affirmed the judgment in January 2015. Cont'l Transfer Technique Ltd. v. Fed. Gov't of Nigeria, 603 F. App'x 1 (D.C. Cir. 2015).

The instant motions are the latest of Continental's many attempts to identify and obtain assets in satisfaction of its judgment against defendants. Nigeria has resisted and delayed post-judgment discovery for several years. This Court granted the motion of FGN's counsel to withdraw from the case in February 2017. See Dkt. No. 119. Since then, no counsel has entered

---

confirmed the August 2008 arbitral award – the same arbitral award that is the focus of the first claim of the amended complaint. See D.C. Code. §15-381 et seq.

4

an appearance for any defendant, and no defendant has participated in this litigation. Nevertheless, Continental has been able to obtain some post-judgment discovery. In March of 2015, a federal district court in the Southern District of New York denied CBN's motion to quash a subpoena that Continental had served on JPMorgan Chase Bank, with whom FGN has a banking relationship. See Cent. Bank of Nigeria et al. v. Cont'l Transfert Technique Ltd., No. 1:14-mc-00066, Dkt. No. 12. (S.D.N.Y. May 5, 2014); see also Mot. at 12. JPMorgan Chase provided two tranches of records to Continental in response to the subpoena, including an inventory of 52 bank accounts associated with Nigeria and data on the wire transfer activity for those accounts in the period of January 2014 to June 2017.

### B. The Writ of Attachment and CBN's Response

On May 29, 2018, Continental filed a motion for a writ of attachment [Dkt. No. 123], seeking to attach an account at JPMorgan Chase Bank that is titled "Central Bank of Nigeria Main Account" ("the Account") and is identified by the account number located in the parties' sealed filings. See Mot. at 1; Hankin Decl. at 2. Relying on subpoenaed records from JPMorgan Chase, Continental alleges that the Account has been funded with at least one $100 million deposit from an account at the Federal Reserve Bank of New York at the direction of defendant FGN. See Reply at 4, 17. CBN disputes this characterization. See Surreply at 8-9. Of the 21,065 wire transfers in the records produced by JPMorgan Chase, Continental has identified dozens of payments from the Account to U.S. entities that, it argues, constitute commercial and non-sovereign activities: aircraft and military equipment and services, tuition payments to U.S. institutions, legal and consulting expenses, technology services and research subscriptions, and professional training costs. See Mot. at 13-19; Hankin Decl. at 3.

On this basis, Continental argues that the Account is subject to attachment under the Foreign Sovereign Immunities Act ("FSIA"). Although the property of a foreign state in the United States is generally immune from attachment under the FSIA, Continental asserts that the Account falls within the exception to sovereign immunity established by 28 U.S.C. § 1610(a), because Nigeria used the funds in the Account for commercial activity. See Mot. at 21. Continental also argues that the Account does not qualify for the immunity created by 28 U.S.C. § 1611, because the Account is not the property of a central bank held for its own account. See id. at 25.

On July 17, 2018, the Central Bank of Nigeria filed a motion [Dkt. No. 126] for leave to file two documents under seal, each attached as exhibits: a motion for leave to intervene and for leave to file a response in opposition to Continental's motion for writ of attachment [Dkt. No. 126-1], and the proffered response in opposition [Dkt. No. 126-2].[3] The motion to intervene characterizes CBN as a "separate and distinct entity from the government defendants." See Mot. Intervene at 2. CBN asserts that it is an instrumentality of the government of Nigeria, chartered by statute to serve as Nigeria's designated central bank. See Ukitetu Decl. at ¶¶ 6, 9. Accordingly, CBN's proffered response in opposition gives only brief attention to one of the primary arguments from Continental's motion for writ of attachment: that the Account may be attached pursuant to the commercial activity exceptions to immunity under 28 U.S.C. § 1610. CBN's primary argument is that "these immunities will not apply" because the Account is owned by the Central Bank of Nigeria, and is thus independently immune from attachment under

---

[3]     CBN later filed on the public docket the redacted versions of its motion for leave to intervene [Dkt. No. 137] and its opposition to Continental's motion for writ of attachment [Dkt. No. 137-1].

28 U.S.C. § 1611, a separate provision of the FSIA. See Opp'n at 15. Other than Continental's first filing, most of the briefing on the motion for writ of attachment – and, thus, the Court's own analysis – concerns the availability of immunity under Section 1611, rather than the commercial activity exception of Section 1610.[4]

In its reply in support of the motion for writ of attachment [Dkt. No. 132], Continental contests CBN's interpretation of the scope of central bank immunity under 28 U.S.C. § 1611. Continental argues that the Account contains the property of Nigeria, not the property of CBN. See Reply at 14-15. Furthermore, Continental says that the Account does not constitute protected central bank property under Section 1611 because the funds in the Account are "used to finance the commercial transactions of other entities" rather than those of the central bank itself. See id. at 19. In the alternative, Continental argues that the Account may be attached even if Section 1611 does immunize some limited property used for third party commercial activity because the particular commercial activities for which the Account is used do not constitute central banking activities as they are normally understood. See id. at 20.

CBN filed a motion for leave to file a surreply [Dkt. No. 138], seeking an opportunity to respond after Continental allegedly raised three new arguments and claims and

---

[4]    CBN also argues that this Court has no jurisdiction to attach funds located in the Account because the account is at a bank located in New York, rather than in Washington, D.C., where this Court is located. See Attachment Opp'n at 8-14. Continental disagrees. See Attachment Reply at 4-13. The Court need not resolve this dispute, however, in order to rule on the motion for writ of attachment. As described infra, Section IV, the Court has concluded that 28 U.S.C. § 1611 conclusively bars attachment of the Account because it constitutes central bank property held for CBN's own account. This holding is dispositive of Continental's motion for writ of attachment, regardless of whether or not the Court has jurisdiction to attach funds held by a bank outside the District of Columbia.

had cited additional authorities that did not appear in Continental's initial brief.  See Surreply

Mot. at 1.  Continental has opposed CBN's motion to file a surreply.  See Surreply Mot. Opp'n.

## II.  RIGHT TO INTERVENE AND TO FILE SURREPLY

### A.  CBN may Intervene as of Right under the Federal Rules

CBN seeks leave to intervene in this matter to defend against Continental's

motion for writ of attachment.  See Mot. Intervene at 2.  Continental does not oppose CBN's

motion for leave to intervene, "for the limited purpose of opposing Continental's motion."  See

Reply at 1, n.1.  The Court will grant CBN's motion to intervene.

Rule 24 of the Federal Rules of Civil Procedure provides that, on timely motion,

the Court:

> must permit anyone to intervene who . . . claims an interest relating
> to the property or transaction that is the subject of the action, and is
> so situated that disposing of the action may as a practical matter
> impair or impede the movant's ability to protect its interest, unless
> existing parties adequately represent that interest.

FED. R. CIV. P. 24(a)(2).  In this circuit, Rule 24(a) requires would-be intervenors to demonstrate

four things: "(1) the application to intervene must be timely; (2) the applicant must demonstrate a

legally protected interest in the action; (3) the action must threaten to impair that interest;

and (4) no party to the action can be an adequate representative of the applicant's interests."

Deutsche Bank Nat'l Tr. Co. v. FDIC, 717 F.3d 189, 192 (D.C. Cir. 2013).

CBN easily satisfies each of these requirements.  First, the filing is timely.  CBN

filed its motion for leave to intervene only a month after Continental filed its writ of attachment,

by which point counsel had already submitted a joint status report notifying the Court of the

forthcoming intervention motion.  Cf. Karsner v. Lothian, 532 F. 3d 876, 885 (D.C. Cir. 2008)

(finding motion timely where petitioner sought intervention less than one month after intervenor's interest in the dispute ripened).

Second, CBN has a legally protected interest in this action because it appears to own and control the asset that Continental seeks to attach. See Deutsche Bank Nat'l Trust. Co. v. Fed. Deposit Insurance Corp., 717 F.3d at 193 ("[Would-be intervenors] point to their economic interest in the receivership funds as a legally protected interest. That much is clearly correct."); Friends of Animals v. Kempthorne, 452 F. Supp. 2d 64, 69 (D.D.C. 2006) (proposed intervenor needs only an interest in the litigation, not a cause of action).

Third, the attachment proceedings pose a clear risk to CBN's legally protected interest in the Account. In determining whether "disposing of the action may as a practical matter impair or impede" the intervening petitioner's interest, FED. R. CIV. P. 24(a), the "practical consequences of denying intervention" are dispositive. See Fund for Animals, Inc. v. Norton, 322 F.3d 728, 735 (D.C. Cir. 2003). Here, the practical consequence of denying CBN's motion to intervene is that no one will oppose Continental's motion for a writ of attachment. Furthermore, if the Court grants the attachment motion, it will imperil any legal interest CBN may have in holding and controlling funds in the Account.

Fourth, the existing parties cannot adequately represent CBN's interests. This requirement sets a low bar. See Public Citizen v. FEC, 788 F.3d 312, 321 (D.C. Cir. 2015). The intervenor "need only show that representation of his interests may be inadequate . . . ." Dimond v. Dist. of Columbia, 792 F.2d 179, 192 (D.C. Cir. 1986). Here, that inadequacy is manifest:

defendants have all but disappeared from this litigation and are not protecting CBN's interest in the Account.[5]

### *B. CBN Has Standing to Intervene*

In addition, CBN has demonstrated that it has standing under Article III of the United States Constitution.  See <u>Roeder v. Islamic Republic of Iran</u>, 333 F.3d 228, 233 (D.C. Cir. 2003) ("[A]n intervenor must also establish its standing under Article III of the Constitution."); <u>Ctr. for Biological Diversity v. U.S. Envtl. Prot. Agency</u>, 274 F.R.D. 305, 309 (D.D.C. 2011) (noting that constitutional standing requires injury-in-fact, causation, and redressability).  In the circumstances presented here, the facts that enable CBN to intervene as of right under Rule 24(a) also establish its constitutional standing.  CBN timely filed a motion to intervene that demonstrated a legal interest in the asset that is the subject of the pending attachment motion. For the purpose of standing, these facts also establish an imminent, concrete, and particularized injury to CBN's interest in the Account; that injury is "fairly traceable to the challenged action" (Continental's attempt to attach the Account).  See <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-64 (1992); <u>cf</u>. <u>United States v. All Assets Held at Bank Julius Baer & Co.</u>, 959 F. Supp. 2d 81, 104 (D.D.C. 2013) ("[T]he inquiry into a claimant's ownership interests is often a surrogate for an inquiry into whether there is injury direct enough and sufficient enough to sustain standing.") (quotations and citations omitted).  Here, it is clear that "the injury will be redressed by a favorable decision" from this Court – that is, CBN will not lose access to the Account if this Court grants leave to intervene and denies the writ of attachment.  See <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. at 561.

---

[5]     Because CBN may intervene as of right pursuant to Rule 24(a)(2), the Court need not consider CBN's arguments for permissive intervention under Rule 24(b).

*C.  CBN May File a Surreply*

CBN has also filed a motion for leave to file a surreply in opposition to

Continental's motion for writ of attachment.  <u>See</u> Dkt. No. 138.  Continental opposes the motion,

and also took the liberty of filing a response to CBN's surreply.  <u>See</u> Dkt. No. 140.  CBN replied

in support of its motion to file a surreply.  <u>See</u> Dkt. No. 142.  "The standard for granting a leave

to file a surreply is whether the party making the motion would be unable to contest matters

presented to the court for the first time in the opposing party's reply."  <u>Lewis v. Rumsfeld</u>, 154 F.

Supp. 2d 56, 61 (D.D.C. 2001).  Some of the propositions in Continental's reply arguably may be

regarded as "matters presented to the court for the first time" insofar as they characterize the

Account in ways that the motion itself did not.  The Court finds that it is in the interest of justice

to allow the filing of CBN's surreply, Continental's response in opposition to the surreply, and

CBN's reply in support of the surreply.  The questions of law and fact involved in resolving the

attachment motion are complex and benefit from full explication.  Furthermore, Continental is

not prejudiced by the Court's acceptance of the surreply because it has already responded to the

substance of the arguments in the surreply.  <u>See</u>  <u>United States v. All Assets Held at Bank Julius</u>

<u>Baer & Co., Ltd.</u>, 307 F.R.D. 249, 251 n. 5 (D.D.C. 2014).

III.  SECTION 1611 OF THE FOREIGN SOVEREIGN IMMUNITIES ACT

*A.  28 U.S.C. § 1611 Provides Immunity to Certain Central Bank Property*

The Foreign Sovereign Immunities Act is the sole basis for obtaining jurisdiction

over a foreign state in the courts of the United States.  <u>See</u> <u>Saudi Arabia v. Nelson</u>, 507 U.S. 349,

355 (1993); <u>GSS Grp. Ltd. v. Republic of Liberia</u>, 31 F. Supp. 3d 50, 57 (D.D.C. 2014), <u>aff'd</u>

<u>sub</u> <u>nom.</u>, <u>GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia</u>, 822 F.3d 598 (D.C. Cir. 2016) (citing

<u>Nemariam v. Fed. Dem. Rep. of Ethiopia</u>, 491 F.3d 470, 474 (D.C. Cir. 2007)).  The FSIA sets

out the circumstances under which foreign sovereigns, their agencies and instrumentalities, and their property are immune from suit, attachment, and execution in the courts of the United States. The Act provides broad immunity for property of a foreign state, with certain enumerated exceptions:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act, the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

28 U.S.C. § 1609. See also Jacobsen v. Oliver, 451 F. Supp. 2d 181, 195 (D.D.C. 2006) ("The FSIA grants blanket immunity to foreign states . . . and then waives it pursuant to the exceptions enumerated therein."). The analysis of whether an exception to immunity applies is fundamentally jurisdictional. See Elbasir v. Kingdom of Saudi Arabia, 468 F. Supp. 2d 155, 160 (D.D.C. 2007) ("At the threshold of every action in a district court against a foreign state . . . the court must satisfy itself that one of the exceptions applies, as subject-matter jurisdiction in any such action depends on that application.").

One of those exceptions is Section 1610, which establishes that, inter alia, "[t]he property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States . . . if . . . the foreign state has waived its immunity from attachment . . . [or] the property is or was used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(1), (3). Section 1611, however, contains an exception to the rule that property used for commercial activity is not immune. The scope of that exception lies at the root of the parties' disputes. Section 1611 provides, in relevant part:

(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—

>  (1) *the property is that of a foreign central bank or monetary authority held for its own account*, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver;

28 U.S.C. § 1611(b) (emphasis added).

Here, it is beyond dispute that the Account is the "property of a foreign state" within the meaning of the FSIA, that CBN is a "foreign central bank," and that CBN has not "explicitly waived its immunity." The litigants disagree, however, as to the meaning of the statutory phrase "property . . . of a foreign central bank or monetary authority held for its own account," and as to whether the Account is such property.

The FSIA does not explicitly confirm the scope of this protection. <u>See</u> 28 U.S.C. § 1611; <u>see</u> <u>also</u> 28 U.S.C. § 1603 (setting out certain definitions). Nor does the law of this circuit explicitly establish when an asset is the "property of a foreign central bank" for purposes of Section 1611(b) or when property of a central bank is "held for its own account." Although they might involve common questions of fact and law, these are two distinct requirements. <u>See</u> Ernest T. Patrikis, <u>Foreign Central Bank Property: Immunity from Attachment in the United States</u>, 1982 U. ILL. L. REV. 265, 275 (1982) ("Section 1611(b)(1) requires the asset to be both property of the central bank and 'held for its own account'"). Continental and CBN have offered different views of these requirements. Accordingly, the Court must interpret both aspects of Section 1611's operative statutory phrase. It does so in Parts III.B and III.C of this Opinion before applying its interpretation to the facts of this case in Part IV.

*B. The Meaning of Section 1611: "Property . . . of a Foreign Central Bank"*

Under Section 1611 of the FSIA, central bank immunity applies where "the property is that of a foreign central bank or monetary authority" – that is, where the central bank owns the property. 28 U.S.C. § 1611(b) (emphasis added); see Weston Compagnie de Fin. Et D'Investissement, S.A. v. La Republica del Ecuador, 823 F. Supp. 1106, 1112 (S.D.N.Y. 1993) ("Weston") (analyzing "property . . . of a foreign central bank" in terms of whether the central bank has legal ownership of the property). In disagreeing over who owns the Account, CBN and Continental implicitly disagree as to how courts should determine ownership of central bank property under Section 1611.

Continental does not propose any binding authority as to how a court should determine who owns a bank account in evaluating an immunity claim under Section 1611. Instead, Continental makes a number of claims about the specific bank account at issue here – including the way the Account is used and the original source of its funds – and asks the Court to conclude that the Account therefore is the property of the Federal Government of Nigeria, and not that of CBN. See Mot. at 25-26; Reply at 2, 15. Under Continental's interpretation of Section 1611, "the FSIA does not provide blanket immunity for all funds held by a central bank, without any inquiry into the true ownership of the funds or the purpose for which the funds are used." See Mot. at 25. But Continental offers no authority to establish that "true ownership" of the Account should be determined by reference to the way the funds are spent or the original source of the funds.[6]

---

[6] Continental's discussion of Nigeria's relationship to the funds in the Account vacillates between reference to Section 1611's "property of" requirement and the "held for its own account" requirement.

14

CBN disputes Continental's argument about how to determine ownership of the Account. It identifies the following factors as relevant to a bank account's ownership: the name in which the account is held (here, the Account is titled "Central Bank of Nigeria – Main Account"), the persons authorized to conduct transactions with respect to the account (for the Account, only CBN officers), and how funds can be withdrawn from the account (for the Account, only by an electronic money order sent from CBN in Nigeria). See Opp'n at 5. In explaining the legal significance of these factors, CBN argues that "[w]hen a party holds funds in a bank account, possession is established and the presumption of ownership follows." See Opp'n at 17 (citing Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 86 (2d Cir. 2002) ("KBC v. Pertamina I")).[7] A later opinion in the KBC dispute states the rule even more plainly: "Because the [disputed] accounts were held in Pertamina's name, Pertamina is their presumptive owner." In re Arbitration Between Karaha Bodas Co., L.L.C. v. Bank of Indonesia, No. 04-6551-CVLL, 2006 WL 565694, at *1 (2d Cir. Mar. 9, 2006). "[T]his presumption may be rebutted by evidence that the Republic of Indonesia actually controlled the disputed funds" or that the named account holder, which was not a central bank, "merely held the funds for the Republic of Indonesia, in the manner of a trustee." KBC v. Pertamina I, 313 F.3d at 86.

The Court agrees with CBN: an account that is registered in the name of a foreign central bank is *presumed* to be the "property of" that foreign central bank under Section 1611 absent specific evidence overcoming the presumption and establishing that the central bank does not own the account. Two considerations support this interpretation of the statutory language.

---

[7] CBN claims ownership of, and immunity for, the entirety of the Account, and therefore all of the funds within it. See Opp'n at 19, 20; Surreply Mot. Opp'n at 9.

First, determining ownership of a bank account by reference to the name of the account is a longstanding principle of banking law:

> [T]he best, if not the only, way in which the possession of a chose in action—such as a bank account—can be shown, is by showing in whose name the account stands, for the person in whose name the account stands has absolute control of it and that is all possession of a chose in action [a property right to recover money – bank deposits, for example] can mean.  Any funds in an account in the name of a foreign central bank are thus funds "of" that foreign central bank.

Weston, 823 F. Supp. at 1112 (quoting Bradford v. Chase Nat'l Bank, 24 F.Supp. 28, 38 (S.D.N.Y. 1938), aff'd sub nom. Berger v. Chase Nat'l Bank, 105 F.2d 1001 (2d Cir. 1939), aff'd, 309 U.S. 632 (1940)).  See also Multi-Clean Prods., Inc. v. Kasper, 279 N.E. 2d 111, 113 (Ill. App. 1971) ("The law presumes that a deposit, or the right to claim  it, belongs to the person in whose name it is found."); 5A MICHIE ON BANKS AND BANKING § 38 (PAUL ERNST, ED., 2014).  The credit of a deposit to a certain person on the bank's books is "prima facie evidence of his ownership." See Catanzaro v. Hillman Commercial Trust Bank, 126 A. 812, 812 (Pa. 1924).  Likewise, the fact that the deposit is in a person's own name and that he draws it out on his personal check is prima facie evidence that the money is his.  See Boatmen's Sav. Bank v. Overall, 3 S.W. 64 (Mo. 1887).  This presumption that the named entity owns the account holds even when a third party is the source of some of the money in an account.  See Rice v. Ransom, 186 Cal. App. 2d 191 (1960) ("When money is paid to or deposited in the bank account of another it is presumed to be due to and belong to the latter."); In re Amdura Corp., 167 Bankr. 640, 644 (D. Colo. 1994) ("Funds deposited into bank account are presumed to belong to the entity in whose name the account is established.").

Second, looking to these longstanding banking law principles at common law is an especially apt approach to interpreting the Foreign Sovereign Immunities Act.  In deciding a

question of ownership under another provision of the FSIA, Section 1610(g), the D.C. Circuit has held that federal statutes "should be interpreted consistently with the common law," unless Congress has expressly abrogated traditional common law principles. See Heiser v. Islamic Republic of Iran, 735 F.3d 934, 938 (D.C. Cir. 2013). In Heiser, plaintiffs attempted to attach certain assets pursuant to Section 1610(g) of the FSIA, which permits attachment of property in satisfaction of judgments under the terrorism exception to immunity. Id. at 937. At issue was the meaning of the statutory phrase "property of a foreign state," and whether that term included electronic funds transfers ("EFTs") in which defendant held only a contingent future possessory interest. Id. at 937-38. The court of appeals concluded that Congress had "not provided a rule for determining ownership under . . . § 1610(g) of the FSIA," id. at 940, and that it had not abrogated common law principles in enacting Section 1610(g). Id. at 938. Nor had Congress otherwise directed federal courts to adopt state ownership rules. Id. at 940. The court of appeals therefore concluded that, in these circumstances, the court must itself "fashion a rule of decision for applying . . . § 1610(g)'s ownership requirement." Id. at 940. Notably, "that rule, though federal, may sometimes follow state law." Id.

In applying this analysis to determine ownership of EFTs under Section 1610(g), the court in Heiser concluded that "Article 4A [of the Uniform Commercial Code] provide[d] an appropriate rule of decision." Heiser v. Iran, 735 F.3d at 940. The court emphasized that Article 4A did not apply "of its own force" – only that it was "a proper federal rule of decision for applying the ownership requirements of . . . § 1610(g)." Id. at 940-41. It noted that the UCC is "often used as the basis of federal common law rules." Id. at 940. And, in Heiser, the UCC offered a "particularly convenient and appropriate measure of ownership because it has been adopted by all fifty states and the District of Columbia . . . ." Id. See also Bennett v. Islamic

Republic of Iran, 825 F.3d 949, 963 (9th Cir. 2016) abrogated on other grounds by Rubin v.

Islamic Republic of Iran, 138 S. Ct. 816 (2018) ("Like most courts, we look to state law to

determine the ownership of assets in [the] context [of Section 1610(g)].").

Indeed, state law often forms the basis of such federal rules of decision where

Congress has not spoken directly on the matter:

> Within the interstices of written federal law, courts often articulate
> federal rules of decision that again draw their substance from state
> law. Rather than tracking the local law of any single state, though,
> these federal rules reflect state law in general; what matters is how
> most states do things, not whatever the policymakers in one
> particular state have said.

Caleb Nelson, The Persistence of General Law, 106 COLUM. L. REV. 503, 503–04 (2006).  See

also Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir.  2003) (explaining that for a

claim seeking damages under the terrorism exception to the FSIA, "common law grounded in . . .

the Restatement (Second) of Torts)[] delineates the controlling substantive law"); Surette v.

Islamic Republic of Iran, 231 F. Supp. 2d 260, 267 (D.D.C. 2002) (considering federal common

law to determine amount of damages available for claim under terrorism exception); Flatow v.

Islamic Republic of Iran, 999 F. Supp. 1, 15 (D.D.C. 1998) (applying "interstitial federal

common law to determine whether [foreign officials'] terrorist acts were within the scope of their

office, agency, or employment" for purposes of the FSIA.

Because Congress has not provided a rule for determining ownership in

Section 1611 itself, this Court – as the D.C. Circuit did in Heiser – must identify the appropriate

source for the federal rule of decision for interpreting the statutory language "property of a

foreign central bank."  In Heiser, the court of appeals turned to Article 4A of the Uniform

Commercial Code, which provides principles relevant to settling the claims of ownership of an

EFT under Section 1610(g).  Article 4 of the Uniform Commercial Code – which governs bank

and deposit accounts – has also been adopted by all 50 states and the District of Columbia.  But Article 4 does not provide guidance on resolving ownership claims like the one at issue here.  Under the reasoning of Heiser, however, this Court has the flexibility to "fashion" an "appropriate rule of decision" to define ownership under Section 1611 of the FSIA.  See Heiser v. Islamic Republic of Iran, 735 F.3d at 940.

Most states have "recognize[d] that the name or title of a bank account creates a presumption of ownership in the titleholder."  See, e.g., Nat'l Bank of Ga. V. Kennesaw Life & Acc. Ins., 800 F.2d 1542, 1545 (11th Cir. 1986) (further explaining that the presumption "is rebuttable and ownership may be placed in some entity other than the titleholder" depending on who opened, funded, and controlled the account); Warner v. Burlington Fed. Sav. & Loan Ass'n, 49 A.2d 93, 97 (Vt. 1946) (holding that, where a person opened a bank account in her own name, she is presumed to own it "until the contrary is shown").  Though neither applies "of its own force," the Court looks to the law of the state in which the bank account is located (New York) and the law of the forum for this action (District of Columbia) – which are consistent with the law of other states – to fashion the rule of decision in this case.  See Heiser v. Islamic Republic of Iran, 735 F.3d at 940-41.

The Second Circuit has applied New York law as the federal rule of decision in interpreting Section 1611, concluding that the name on the title of the bank account (or the owner to which it is otherwise registered) connotes the presumptive owner of the account.  See EM Ltd. v. Republic of Argentina, 473 F.3d 463, 474 n. 10 (2d Cir. 2007) ("Under the FSIA and the Federal Rules of Civil Procedure, New York law governs the circumstances and manner of attachment and execution proceedings. . . . In attachment actions involving foreign states, federal courts thus apply FED. R. CIV. P. 69(a), which requires the application of local state

procedures.").  "Under New York law, the party who possesses property is presumed to own it, and one who holds funds in a bank account possesses that account and the presumption of ownership follows."  In re Suntech Power Holdings Co., 520 B.R. 399, 411 (Bankr. S.D.N.Y. 2014) (citing KBC v. Pertamina I, 313 F.3d at 86 (explaining that the party who possesses property is presumed to be the owner; but the presumption of ownership can be rebutted – for an account held by a state-owned oil company – by evidence that someone else controls the funds or that the funds are merely held by named account owner as a trustee)).  The Second Circuit's analysis is persuasive both as to the requirements of New York law and as an interpretation of ownership that is consistent with the UCC, which New York has also adopted.

The same presumption of ownership results if the Court considers District of Columbia law.  Although the Court has found no cases from any court in the District of Columbia declaring that one in whose name a bank account is held is the presumptive owner of the account, there is District of Columbia law that supports this principle.  See e.g, Reed v. Rowe, 195 A.3d 1199 (D.C. 2018) (finding that plaintiff and his sister, whose names appeared on a bank account, continued to own the account even after plaintiff's marriage because plaintiff had not successfully filed the paperwork required to change the name on the account); Morrison v. Potter, 764 A.2d 234 (D.C. 2000) (determining that an account was a joint tenancy by the entireties and assuming ownership thereof based on the names present on the account).

In short, under the principles announced in Heiser, the Court draws from the laws of both New York and the District of Columbia – which mirror longstanding banking law and the consensus of other states – to conclude that a bank account is presumed to be the property of the person or entity whose name appears on the account or to whom the account is registered.  The Court therefore concludes that a bank account held in the name of a foreign central bank is

presumptively the "property of" that foreign central bank under Section 1611 of the FSIA. That presumption can be rebutted only by providing evidence that the Account is not, in fact, the property of the foreign central bank. See <u>KBC v. Pertamina I</u>, 313 F.3d at 86.

 For bank accounts generally, evidence rebutting the presumption of ownership could include, for example, evidence that account ownership has changed; that the information on the account registration or named owner is erroneous; or that the named account holder is merely a trustee for the true owner. See <u>KBC v. Pertamina I</u>, 313 F.3d at 86. But in light of the substantial immunity conferred on central banks by Section 1611, the quantum of evidence needed to rebut the presumption of ownership for central bank accounts is quite substantial. Even the allegation that a central bank is merely the alter ego of its parent state is not generally sufficient. See <u>NML Capital, Ltd. v. Banco Central de la Republica Argentina</u>, 652 F.3d 172, 187-88 (2d Cir. 2011) ("<u>NML Capital</u>") ("We hold that the plain language, history, and structure of § 1611(b)(1) immunizes property of a foreign central bank or monetary authority held for its own account without regard to whether the bank or authority is independent from its parent state pursuant to <u>Bancec</u>.") (discussing <u>First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba</u>, 462 U.S. 611 (1983) ("<u>Bancec</u>")).

### C. The Meaning of Section 1611: Property of a Central Bank "Held for its Own Account"

#### 1. The Parties' Arguments

 Section 1611 of the FSIA provides immunity to the property of a central bank only where it is "held for [the bank's] own account." The statute itself does not define this term. Continental encourages adoption of an interpretation in the legislative history that Judge Harold Greene cited in a 1994 opinion, <u>Banco Cent. de Reserva del Peru v. Riggs Nat'l Bank of</u>

Washington, D.C., 919 F. Supp. 13 (D.D.C. 1994) ("Riggs"). See Mot. at 26, n.2; Reply at 15-16, 18-20. In reporting the bill out of committee, the House Committee on the Judiciary said that Section 1611 includes an essential distinction:

> Section 1611(b)(1) provides for the immunity of central bank funds from attachment or execution. It applies to funds of a foreign central bank or monetary authority which are deposited in the United States and 'held' for the bank's or authority's 'own account'-- i.e., *funds used or held in connection with central banking activities, as distinguished from funds used solely to finance the commercial transactions of other entities or of foreign states*. If execution could be levied on such funds without an explicit waiver, deposit of foreign funds in the United States might be discouraged. Moreover, execution against the reserves of foreign states could cause significant foreign relations problems.

See H.R. Rep. 94-1487, 94th Cong., 2d Sess. 31 (1976) ("House Report") (emphasis added). In Riggs, Judge Greene quoted this language to observe that "Section 1611 covers property of a foreign bank held for its own account. In other words, it exempts only those funds 'used or held with [sic] central banking activities, as distinguished from funds used solely to finance the commercial transactions of other entities or of foreign states.'" Riggs, 919 F. Supp. at 17 (quoting H.R. Rep. 94-1487).

CBN, on the other hand, encourages the Court to adopt an understanding of central bank property "held for its own account" that was articulated by the United States Court of Appeals for the Second Circuit in NML Capital. See Opp'n at 17-18; Surreply at 7-14 (citing NML Capital, 652 F.3d at 194). In interpreting "held for its own account," the Second Circuit adopted a "modified test," which "combines the plain language of the statute and the central bank activities tests" adopted by several district courts. See NML Capital, 652 F.3d at 194 (quotations omitted). Under the modified central bank functions test, "property of a central bank is immune from attachment if the central bank uses said property for central banking functions,

as such functions are normally understood, irrespective of their commercial nature." Id. at 194

(citing Patrikis, 1982 U. ILL. L. REV. at 275-77; Olympic Chartering, S.A. v. Ministry of Indus.

& Trade of Jordan, 134 F. Supp. 2d 528, 534 (S.D.N.Y. 2001)).  Under the modified central bank

functions test adopted in NML Capital, the Second Circuit interpreted the statutory requirement

as establishing a rebuttable presumption:

> Where funds are held in an account in the name of a central bank or
> monetary authority, the funds are presumed to be immune from
> attachment under § 1611(b)(1). . . . A plaintiff, however, can rebut
> that presumption by demonstrating with specificity that the funds
> are not being used for central banking functions as such functions
> are normally understood, irrespective of their 'commercial' nature.

Id.

     In short, based on the House Report, Continental would exclude from central bank

immunity funds that are used solely to finance the commercial transactions of other entities.  The

Second Circuit in NML Capital, by contrast, would immunize any funds that are used for central

banking functions as they are normally understood – even if they are characterized as

commercial.  Continental's analysis is problematic in two respects: it overstates the importance

of the House Report and it understates the importance of the NML Capital modified central bank

functions test.

     First, Continental argues that the motion for writ of attachment "is *governed* by

Riggs and the legislative history of the FSIA, which courts in this District have *repeatedly* relied

on in other cases." Mot. at 26, n. 2 (emphasis added).  Not so.  The Court of Appeals and district

judges in this circuit have cited other portions of the House Report on a number of occasions in

interpreting *other* provisions of the FSIA, but not Section 1611's central bank immunity.  See,

e.g., Weinstein v. Islamic Republic of Iran, 831 F.3d 470, 479 n.15 (D.C. Cir. 2016) (citing

House Report to explain that certain Sections of the FSIA apply only after the award of a valid

judgment); <u>Owens v. Republic of Sudan</u>, 141 F. Supp. 3d 1, 5 (D.D.C. 2015) (citing the House

Report for an interpretation of the commercial activities exception).  Indeed, Judge Greene in

<u>Riggs</u> is the only judge within this circuit to have relied on the House Report to interpret central

bank immunity under Section 1611.  Furthermore, his observations on this score – as he himself

noted – were dicta:  "Section 1611(b)(1) . . . does not apply to the case at hand" since it involved

a setoff, and Section 1611 "provides for immunity from attachment and execution, not immunity

from setoff."  See <u>Riggs</u>, 919 F. Supp. at 17.  This Court is not aware of any other cases that rely

on the House report to interpret the scope of central bank immunity under Section 1611.[8]  <u>Riggs</u>

alone hardly establishes that courts "repeatedly [rely]" on the House Report.  Nor can it be said

that a decision by the undersigned on the instant attachment motion is "governed by <u>Riggs</u>."  An

opinion from another district judge does not bind this Court.

Second, Continental understates the import of the Second Circuit's <u>NML Capital</u>

decision, arguing that:

> <u>NML Capital</u> has not been cited by any courts in this Circuit, or by
> any other Circuit Courts of Appeals.  Indeed, the vast majority of
> cases citing <u>NML Capital</u> are from within the Second Circuit.  Given
> that Continental's Motion is pending in this Court, and not in the
> Second Circuit, CBN should not be permitted to rely on <u>NML
> Capital</u> to the exclusion of <u>Riggs</u> and the House Report . . . .

Reply at 19-20.  It is unsurprising that the "vast majority of cases" citing <u>NML Capital</u> come

from courts within the Second Circuit, which includes New York State and New York City,

---

[8]     One case mentioned elsewhere in Continental's briefing, which did not concern
the property of a central bank, cites the House Report without discussing the meaning of
"property of a foreign central bank held for its own account."  See <u>Birch Shipping Corp. v.
Embassy of United Republic of Tanzania</u>, 507 F. Supp. 311, 313 (D.D.C. 1980).

arguably the financial capital of the country.[9] By one tally, "[t]he [Federal Reserve Bank of New York ("FRBNY")] holds $3 trillion in U.S. dollar-denominated assets at the bank, more than half of the world's official U.S. dollar reserves." Note, <u>Too Sovereign to be Sued: Immunity of Central Banks in Times of Financial Crisis</u>, 124 HARV. L. REV. 550, 552 (2010). <u>See also</u> <u>NML Capital</u>, 652 F.3d at 177 n. 7 (FRBNY provides accounts for approximately 250 central banks and monetary authorities with a cumulative balances of $3 trillion as of 2010.).

This concentration of central bank assets in New York has important implications: the "presence . . . of a substantial portion of the potential sources of income for an expanding, litigious set of sovereign creditors has made the Southern District of New York the focal point of venue in the emerging world of sovereign debt enforcement." 124 HARV. L. REV. at 552. So, although <u>NML Capital</u> is not binding on this Court, decisions by the Second Circuit and district judges in that circuit merit substantial attention on questions of central bank immunity. <u>See</u> Brief of Amicus Curiae the Federal Reserve Bank of New York, <u>NML Capital</u>, 2010 WL 3032829 at *4 ("As one of the largest custodians in the world, if not the largest custodian, of foreign official reserves, the FRBNY has a substantial interest in a stable and certain legal environment for foreign central bank assets.").

Furthermore, where the D.C. Circuit lacks binding legal authority, prudence and comity weigh in favor of looking to leading authority from other circuits where it is persuasive and correctly reasoned. <u>See</u> <u>Practical Concepts, Inc. v. Republic of Bolivia</u>, 811 F.2d 1543 (D.C. Cir. 1987) (R.B. Ginsburg, J.) (embracing the "rule of thumb" devised by the Second Circuit for interpreting the commercial activity exception to immunity under Section 1605 of the FSIA).

---

[9]       The Court is not aware of any case in which a judge in the D.C. Circuit has had occasion *after* <u>NML Capital</u> to interpret the scope of central bank immunity.

2.    The Court's Interpretation of Central Bank Property "Held for its Own Account"

The Court concludes that granting immunity to an account under the name of a central bank – unless petitioner establishes with specificity that its funds are "not being used for central banking functions as such functions are normally understood" – is consistent with the FSIA's text, structure, and purpose.  See NML Capital, 652 F.3d at 188-94 .

As always, "[t]he starting point for interpreting a statute is the language of the statute itself."  U.S. ex rel. Findley v. FPC Boron Employees' Club, 105 F.3d 675 (D.C. Cir. 1997).  The text of Section 1611(b) makes clear that it applies not just to bank accounts but to all "property of a central bank . . . held for its own account."  Where the property in question is itself an "account" – a bank account – the most natural reading of "central bank property . . . held for its own account" is that it refers to an account under the central bank's own name.  See NML Capital, 652 F.3d at 191 ("Under the so-called plain language test," the "property of a central bank is 'held for its own account' if it is in an account in the central bank's name[,] because [u]nder fundamental banking law principles, a positive balance in a bank account reflects a debt from the bank to the depositor and no one else.").

As for legislative history, it is of limited utility here.  The question is not what Continental thinks Congress may have intended, "but what Congress enacted in the FSIA."  See Republic of Argentina v. NML Capital, Ltd., 573 U.S. 134, 145-46 (2014) (applying another provision of the FSIA) (internal quotations and citations omitted).  The reading of Section 1611 advanced by Continental would use the sparse legislative history it cites to exclude from immunity "funds used solely to finance the commercial transactions of other entities or of foreign states," but not those of the central bank itself.  This limitation on central bank immunity, however, is in "tension" with the text of the FSIA (and, as described below, its purpose and

structure).  See NML Capital at 194.  What Congress actually enacted in Section 1611 is a broad

grant of immunity that contains no restrictions based on any particular kind of commercial use.

The NML Capital interpretation is consistent with this broad immunity because, like the text, it

contains no default exclusions.

 To the extent that statutory language may be considered ambiguous or in tension

with legislative history, the Court may of course look beyond the text to "other indicia of

Congressional intent," including the purposes of the law and other portions of the statute.  See

United States v. Villanueva-Sotelo, 515 F.3d 1234, 1237-43 (D.C. Cir. 2008).  To rely on the

paragraph from the House Report cited by Continental in isolation would undermine the

structure of immunities established by other portions of the FSIA.  Under Section 1604, the Act

protects from attachment all sovereign property unless specifically excepted: for example,

Section 1610's provision that "property in the United States of a foreign state . . . used for

commercial activity" is not immune from attachment.  Importantly, however, Section 1611 is an

explicit exception to Section 1610: it provides immunity "notwithstanding the provisions of

section 1610 of this chapter."  28 U.S.C. § 1611(b). The NML Capital rule takes account of this

dynamic:  "The structure of the FSIA suggests that property used for commercial activity and

property of a central bank held for its own account are not mutually exclusive categories,

because some property of a central bank held for its own account is a category of property used

for commercial activity."  NML Capital, 652 F.3d at 193 (emphasis in original).

 Other courts and commentators have also concluded that the FSIA's structure

does not support the restricted view of immunity urged by Continental.  Even before NML

Capital was decided, a district judge in the Second Circuit rejected the argument that the external

commercial aims of borrowed funds contained in accounts registered to Ecuador's central bank

destroyed the immunity of the accounts:

> On its face, [the House Report] might seem to support the dichotomy proposed by plaintiff, that property used for commercial activity and property held by a central bank for its own account are mutually exclusive categories. To accept such a reading, however, would be to allow the House Report to supersede the actual language of the statute, a dubious course.

Weston, 823 F. Supp. at 1112 (discussing the structure of the FSIA's interlocking immunities).

In short, "[a]pplying the House Report version of held for its own account would simply re-state

[Section 1610's] protection, rendering Section 1611 mere surplusage."  124 HARV. L. REV.

at 556.  This Court agrees completely.  The Reporters to the Fourth Restatement of Foreign

Relations Law put it this way:

> Although some decisions have suggested that assets used for a commercial activity are not held for the central bank's "own account," . . . the better interpretation is that "held for its own account" must include property used for commercial activities because State property not used for a commercial activity is already immune from execution, whether or not owned by a central bank.

RESTATEMENT (FOURTH) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 464,

Reporters' Note 8 (AM. LAW INST. 2017) (citing NML Capital, 652 F.3d at 194-95).[10]

     In addition, Congress' purpose in enacting the FSIA is best served by the broad

immunity set out by the modified central bank functions test announced by the Second Circuit in

---

[10]     Reporters Notes do not reflect the official position of the American Law Institute. They "are regarded as the work of the Reporter (or Reporters).  Nevertheless, they are submitted for review together with the other components of the Section to which they pertain. Reporter's Notes set forth and discuss the legal and other sources relied upon by the Reporter in formulating the black letter and Comment and enable the reader better to evaluate these formulations . . . ." American Law Institute, ALI Style Manual 45 (2015), available at https://www.ali.org/media/filer_public/08/f2/08f2f7c7-29c7-4de1-8c02-d66f5b05a6bb/ali-style-manual.pdf.

NML Capital.  "It is plain from the structure of the FSIA that 'property . . . of a foreign central bank or monetary authority held for its own account,' 28 U.S.C. § 1611(b)(1), was intended by Congress to be accorded special treatment."  Weston, 823 F. Supp. at 1110.  The aim of conferring central bank immunity is "to encourage U.S. bank deposits and minimize disruption of foreign relations if a country's reserves were attached."  See 1 Ved P. Nanda & David K. Pansius, LITIGATION OF INTERNATIONAL DISPUTES IN U.S. COURTS § 3:51 (2d ed. 2008).  As the Federal Reserve Bank of New York has warned, "[a]n inadequate or uncertain immunity law might prompt central banks to move their reserves to more hospitable jurisdictions."  Brief of Amicus Curiae the Federal Reserve Bank of New York, NML Capital, 2010 WL 3032829, at *4.  To adopt the reading of Section 1611 proposed by Continental might encourage foreign sovereigns to remove reserve assets from the United States, which runs counter to the purpose of the FSIA: "to provide special protection and legal certainty for foreign central bank accounts in the United States in order to encourage foreign central banks to deposit their reserves here."  Id. at *13-14.

 The need for legal certainty to encourage foreign central banks to deposit funds in United States banks underscores the correctness of the NML Capital standard:  The NML Capital modified central bank functions test does not rely on jurisdiction-specific or fact-intensive inquiries into the commercial or non-commercial nature of transactions.  In beginning with the *presumption* that central bank funds are immune "irrespective of their commercial nature," NML Capital, 652 F.3d at 194, the modified central bank functions test offers litigants a reasonable measure of certainty, subject only to the broad qualification that the property must be used for customary central bank activities.  And while there is "no definitive list" of such activities, the Second Circuit intimated that the presumption could be rebutted only by obvious departures from

the norm: "Even in unusual circumstances it is not difficult to tell whether a central bank is engaged in a function characteristic of central banks." See <u>NML Capital</u>, 652 F.3d at 194 n.20. The result is a two-step modified central bank functions test that encourages courts to deny immunity only where it is clearly inappropriate.

In sum, by excluding from immunity only funds that are not used for central banking activities, the <u>NML Capital</u> rule is consistent with the language, structure, and purposes of the statute. Its exception to immunity is neither over exclusive (reaching commercial activities that should be immune) nor under-exclusive (allowing activities that are not part of the central bank activity the statute aims to protect).[11]

## IV.  ANALYSIS:  THE CBN ACCOUNT'S IMMUNITY UNDER 28 U.S.C. § 1611

### A.  The Account is the Property of a Foreign Central Bank

For the reasons discussed above, the Court presumes that a bank account is the "property of a foreign central bank" for purposes of Section 1611 if the bank account is held in the name of the foreign central bank.  See <u>KBC v. Pertamina I</u>, 313 F.3d at 86.  Here, it is beyond dispute that the property Continental seeks to attach is a bank account named "Central Bank of Nigeria Main Acct."  See Mot. at 25, n. 15; Ukietetu Decl. at ¶ 18.  Accordingly, the Court presumes that the Account is the property of CBN.

---

[11]     Perhaps recognizing the structural flaw of its exclusive reliance on the House Report, Continental hedges its bets.  It appears to concede that property used for commercial activity may also be property held for a central bank's own account – but only if it is CBN's "own commercial activity."  See Reply at 22.  This argument creates a false distinction, however: there is no textual basis in the FSIA for the conclusion that Section 1611 distinguishes between the central bank's "own" commercial activity and commercial activity that, though undertaken with funds in a central bank account, constitutes "other" commercial activity.

In the context of the FSIA – which provides broad immunity to encourage foreign central bank deposits – this presumption is especially difficult to overcome. For accounts registered to central banks, it is not enough to establish that, as Continental argues, some of the funds originated with another owner or benefit an entity other than the bank. Information of that kind can, under certain circumstances, rebut the ownership of deposit accounts. See Nat'l Bank of Ga. v. Kennesaw Life & Acc. Ins., 800 F.2d at 1545 (explaining that the presumption of ownership "is rebuttable and ownership may be placed in some entity other than the titleholder" depending on who opened, funded, and controlled the account). But central bank accounts are different: Congress has singled them out for special protection even though almost all of them receive money from their chartering nations, work for the benefit of those nations, and receive input in varying degrees from external stakeholders. See Patrikis, 1982 U. ILL. L. REV. at 276 (noting that, if the account is in the name of the central bank, "[c]ourts should consider the property invested by a foreign central bank in United States markets to be the property of the foreign central bank irrespective of the original source of those funds.").

In that context, it is significant that Continental does not contest the following undisputed facts about the Account: It is held solely in the name of CBN; only CBN is authorized to transfer funds out of the Account; only officers of CBN can conduct transactions with respect to the Account; and the withdrawal of funds can only be accomplished by SWIFT payment order sent from CBN in Nigeria. See Opp'n at 5 (citing a declaration from a CBN's Deputy Director of Banking and Payment Systems Department). Notably, JPMorgan Bank itself considers "the Central Bank of Nigeria [to be] the sole owner" of the Account. Id. at 5 (citing the declaration of an Executive Director of Sovereign Client Coverage at JPMorgan Chase Bank's Treasury Services unit).

Despite these undisputed facts, Continental seeks to rebut the presumption that the "Central Bank of Nigeria Main Acct." is the property of the Central Bank of Nigeria on two grounds: "[1] because Nigeria deposited at least $100 million into the account and [2] because CBN, at Nigeria's sole direction, used the funds to pay Nigeria's commercial bills in the U.S." Reply at 17. But the evidence Continental proffers concerning the source of the funds and the asserted affirmative instructions from the Nigerian government consists of little more than conclusory assertions. See Surreply Opp'n at 4-5; Mot. Ex. 62. Similarly sparse information is provided with respect to the outgoing transfers, which Continental alleges to be commercial transactions undertaken at Nigeria's direction. See Surreply Opp'n at 4. On this basis, Continental would have the Court conclude that Nigeria exercised "sole discretion" over the transactions.

Without more, neither of Continental's conclusions follows from the evidence it provides about the incoming $100 million transfer or the outgoing transfers to the third parties. Continental has not introduced any evidence from JPMorgan Chase to explain the meaning of the raw data in the bank records. Nor has Continental produced evidence from CBN, FGN, or others that sheds adequate light on the circumstances under which the transactions took place, who made the decisions, and who issued the commands concerning the transactions. By contrast, CBN has produced hard evidence directly countering Continental's assertions: a declaration from a bank official that CBN is the sole owner of the account, that the inbound transfer was ordered by CBN, and that "only CBN can authorize transfers in and out" of the Account. See Ukitetu Suppl. Decl. at ¶¶ 4-6; Surreply at 9.

Furthermore, even if Continental had established through evidence that FGN ordered money into the account and requested payments from it, those facts would not

necessarily rebut the presumption. "[C]entral banks ordinarily have a high degree of interaction with their parent foreign governments," receiving money from them, using the money in a way that advances the country's goals, and often performing payment functions for their governments – none of which vitiates their immunity. See EM Ltd., et al. v. Banco Cent. De La Republica Argentina, 800 F.3d 78, 93-94 (2d Cir. 2015). If a country's directions to its central bank could cause ownership of the central bank's assets to be "transferred to the [country itself]" – which is the implication of Continental's arguments – then "creditors of a foreign state [could] attach all of the assets of the state's central bank any time the foreign state issues directives affecting the central bank's reserves." See EM Ltd. v. Republic of Argentina, 473 F.3d at 475-76. "There is no indication in the text, history, or structure of the FSIA that Congress intended to make the immunity of a central bank's property contingent on the independence of the central bank." NML Capital, 652 F.3d at 190 (rejecting, in the context of Section 1611(b)(1), application of the alter ego immunity exception recognized by the Supreme Court in Bancec).

While Continental asserts that it "is not making a Bancec alter-ego argument," see Reply at 17, its argument on the "property of" question consists almost entirely of speculation about the "true owner" of the Account and its claim that Nigeria controls and benefits from the Account despite the formalities of ownership and control vested in CBN. See id. at 16-17. These are nothing if not alter-ego arguments. See GSS Grp. Ltd., 31 F. Supp. 3d at 62 (noting that, under Bancec, "the presumption of independent status can be overcome . . . where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created"). Continental's arguments appear to be an attempt to claim the advantage of the Bancec alter-ego exception to central bank immunity conferred by Section 1611(b)

without establishing that FGN exercises day-to-day control over the account.  See EM Ltd. v. Banco Cent. De La Republica Argentina, 800 F.3d at 95 (interpreting Bancec).

Finally, if the funds' ownership as a matter of Nigerian law is relevant to this Court's FSIA inquiry, as Continental claims, that law does not conclusively establish the Account's ownership.  CBN's enabling statute says only that CBN "shall receive and disburse Federal Government moneys and keep accounts thereof," and that it may appoint another bank to collect and pay such money.  See Reply at 15 (quoting Ukitetu Decl., Ex. A., § 36(2)-(3)). Continental relies too heavily on the formulation "Federal Government moneys."  The most natural reading of the enabling statute is that it identifies the purpose and duties of the bank – to manage certain pools of money – rather than clarifying the technical details of ownership of the funds after they have been given to the bank.  And Continental's reply is devoid of any authority or argument as to the ownership of bank accounts under the Nigerian law of property, contract, or financial instruments.  Furthermore, even if CBN's enabling statute does suggest that Nigeria retains ownership of some of the funds, the FSIA confirms that such funds can also be the property of CBN that is immune from attachment.  Section 1611(b) lists central bank property as a subset of the kind of property of a foreign state eligible for immunity.  See NML Capital, 652 F.3d at 188 ("[T]he plain language of the statute suggests that Congress recognized that the property of a central bank, immune under §1611, might *also* be the property of that bank's parent state.") (emphasis in original).

## B.  The Central Bank's Property is Held for CBN's Own Account

As discussed supra in Part III.C, an account under the name of a foreign central bank is presumed to be "held for [the central bank's] own account" under Section 1611.  That presumption can be overcome only if the party seeking attachment can demonstrate with

specificity that "the funds are not being used for central banking functions as such functions are normally understood" – this is true "irrespective of [the functions'] commercial nature." NML Capital, 652 F.3d at 194. This determination generally is considered a mixed question of law and fact: the Court must determine both how the funds are held or used, and the legal significance of that use. Cf. Af-Cap. Inc. v. Republic of Congo, 383 F.3d 361, 368 (5th Cir. 2004) (interpreting Section 1610's commercial activity exception to immunity).

Here, there is no factual dispute as to how the funds are being used. See Opp'n at 20 ("CBN's principle functions are to issue legal tender, maintain external reserves . . . and to act as a banker for [FGN] and the state and local governments of Nigeria."). With respect to CBN's service as a banker to Nigeria, Continental maintains – and CBN agrees, see Opp'n at 7 – that CBN is using the Account to pay for certain commercial bills owed in the United States by non-bank individuals and entities. See Reply at 17-18 (Continental); Opp'n at 7 (CBN). CBN explains that "[e]ach of the payments identified . . . in support of Continental's motion was made from the U.S.-dollar denominated reserves maintained in the Account in furtherance of CBN's role as banker to the FRN." Opp'n at 7. Specifically:

> When a Nigerian federal, state, or local government entity is required to make a dollar-denominated payment to a third party, the entity first makes a payment to CBN in the Nigerian currency, the Naira. CBN then transfers the U.S.-dollar equivalent from the Account to the designated third party. . . . [T]he funds remaining in the Account after such transfers are made, continue to be the external reserves of CBN.

Id. at 7. The Court has no reason to dispute any of these facts.

Since the Account is held in CBN's name, the only question is whether Continental has introduced evidence sufficient to establish that these uses do not amount to central banking functions as they are normally understood. See NML Capital, 652 F.3 at 194.

There is "no definitive list of activities 'normally understood' to be central banking functions." Id. at 194 n. 20; see also Weston, 823 F. Supp. at 1113. Central banking functions, however, encompass a broad range of conduct, to include maintaining foreign exchange reserves, maintaining monetary supply, and issuing currency, among others. See NML Capital, 652 F.3d at 195; Patrikis, 1982 U. ILL. L. REV. at 274.[12] Courts and commentators have recognized that the very type of conduct engaged in by CBN here – serving as a banker to FGN by paying certain commercial debts in the United States – is a standard central banking activity. See Weston, 823 F. Supp. at 1113 (making payments on behalf of a state-owned telephone company is a central banking function); EM Ltd. v. Republic of Argentina, 865 F. Supp. 2d 415, 424 (S.D.N.Y. 2012) ("[U]se of a central bank's foreign reserves to pay the commercial debt of the sovereign is a traditional banking function."). See also Patrikis, 1982 U. ILL. L. REV. at 277 ("When the central bank acts as a bank for its parent foreign state and its agencies and instrumentalities . . . it is engaged in a central banking and government function.");[13] Douglas W. Arner et al., Central Banks and Central Bank Cooperation in the Global Financial System, 23

---

[12]    As Ernest Patrikis, a former Deputy General Counsel for the Federal Reserve Bank of New York, points out: "Central banks engage in a broad variety of activities in addition to typically holding their countries' reserves. The following can be regarded as central bank activities: (1) issue of notes, coin, and legal tender, (2) custody and administration of the nation's monetary reserves through the holding of gold, silver, domestic and foreign securities, foreign exchange, acceptances, and other credit instruments, and IMF Special Drawing Rights, (3) establishment and maintenance of reserves of depository institutions, (5) receipt of deposits from the government, international organizations, depository institutions, and in special cases, private persons, (6) open market operations (7) credit controls, and (8) licensing, supervision, and inspection of banks." Patrikis, 1982 U. ILL. L. REV. at 274.

[13]    Mr. Patrikis also addresses a scenario much like the one at issue here. "[T]the fact that a foreign central bank uses a dollar deposit account with a bank in the United States to make or receive payments relating to the commercial activities of other foreign government agencies does not cause the central bank's actions to be regarded as a [non-immune] commercial activity." Patrikis, 1982 U. ILL. L. REV. at 277.

PAC. MCGEORGE GLOBAL BUS. & DEV. L.J. 1, 15 (2010) ("[C]entral banks are generally responsible for overseeing national payments and often act as their central operator."); John W. Head, Getting Down to Basics: Strengthening Financial Systems in Developing Countries, 18 TRANSNAT'L L. 257, 261 (2005) ("[T]he central bank usually serves as a banker, agent, and adviser of the government. In this role, the central bank is involved in . . . serving as a depository for government funds . . . and receiving and disbursing government moneys.").

Continental argues that holding funds in the Account for the benefit of Nigeria and using those funds to pay Nigeria's commercial bills, "without any apparent discretion, cannot qualify as a central banking activity" because "to conclude otherwise would effectively allow the limited exception of immunity granted to central banks pursuant to 28 U.S.C. § 1611 to swallow the rule." Reply at 18. But Continental has offered no authority – no scholarly articles, no case law, no information about the conduct of analogous central banks – to support this argument, much less any evidence showing that CBN's conduct falls outside the scope of normal central banking activities. Accordingly, the Court concludes that the Account is the property of CBN and is held for CBN's own account. It therefore is immune from attachment under 28 U.S.C. § 1611(b)(1).

### C. "Mixed-Use" Arguments do not Alter Immunity of the Account

As an alternative to its primary arguments, Continental notes that "at minimum, the [Account] may contain a mix of funds owned by CBN that are immune, and funds owned by Nigeria, that are not immune," and claims that such "mixed-use accounts are still subject to attachment." Reply at 16 (emphasis added) (citing Birch Shipping Corp. v. Embassy of United Republic of Tanzania, 507 F. Supp. at 313). While the court in Birch Shipping did say that the "[central bank] exception is not applicable to accounts used for mixed purposes," id., there are

two reasons why this mixed use argument does not alter the Court's conclusions that the Account is the property of CBN and that it is used for CBN's own account.

First, <u>Birch Shipping</u> has limited applicability to this case because it entailed facts that are distinct in several relevant respects from the facts in the instant case. For example, the court in <u>Birch Shipping</u> held that a checking account belonging to a foreign *embassy* was not immune from garnishment under Section 1610 of the FSIA. Accordingly, it did not interpret the scope of *central bank* immunity under Section 1611 that is at issue here. <u>Birch Shipping Corp. v. Embassy of United Republic of Tanzania</u>, 507 F. Supp. at 312. Furthermore – and relatedly – the court in <u>Birch Shipping</u> denied Section 1610 immunity upon finding mixed non-commercial and commercial uses for the embassy account, relying centrally on the defendant's own admissions that the account was used for a commercial activity. <u>Id</u>. Such commercial use is fatal to a claim for embassy property immunity under *Section 1610*; as described above, however, commercial use does not vitiate immunity from attachment for property of a central bank under the enhanced protections of Section 1611. Indeed, <u>Birch</u> has not been embraced by other judges in this circuit to bar immunity even for mixed-use accounts belonging to the government, let alone accounts that are the property of a central bank. <u>See</u> <u>Liberian Eastern Timber Corp. v. Government of the Republic of Liberia</u>, 659 F. Supp. 606, 610 (D.D.C. 1987) ("The Court . . . declines to order that if any portion of a bank account is used for a commercial activity then the entire account loses its immunity.").

Second, even if the <u>Birch Shipping</u> holding were to be applied to central bank immunity under Section 1611, Continental has not established that the Account contains both funds that are used for immune central bank activities and funds that are not. Continental claims that the commercial transactions for Nigeria's government are not immune activities of a central

bank. That is not true. See supra at 34-37. And, even if the account did contain some arguably non-immune funds, Continental has proposed no mechanism by which the Court could reliably distinguish between immune and non-immune funds. Furthermore, CBN has introduced evidence that *all* of the funds within the Account, including those remaining after payment of third-party obligations, are part of CBN's external reserves. This is a paradigmatic central banking activity, so such funds are immune. See Ukitetu Decl. at ¶¶ 21-24; Suppl. Ukitetu Decl. ¶ 6. Continental has not effectively countered this evidence, asserting only that "CBN's contention that the main account consists solely of external reserves is not credible" because an account "used to conduct the commercial business of Nigeria cannot be considered [reserves]." Reply at 23. But, as already explained, the commercial use of the property of a central bank does not vitiate its immunity. Accordingly, there is no basis for concluding that some portion of the Account is not immune.

## V. CONCLUSION

For the foregoing reasons, CBN's motion to intervene in opposition to the writ of attachment [Dkt. Nos. 126-1 (sealed) and 137 (redacted)] and its motion to file a surreply [Dkt. Nos. 138 (sealed) and 139 (redacted)] are granted. Continental's motion for attachment [Dkt. Nos. 123 (sealed) and 134 (redacted)] is denied. An Order giving effect to this Opinion shall issue this same day.

_____
PAUL L. FRIEDMAN
United States District Judge

DATE: August 6, 2019